## Case No. 14,312.

### TYLER et al. v. WILKINSON et al.

[4 Mason, 397.] 1

Circuit Court, D. Rhode Island. June Term, 1827.

RIPARIAN RIGHTS—USE IN WATER—PRIORITY OF OCCUPANCY—PRESUMPTION OF RIGHT.

1. Primâ facie every proprietor upon each bank of a river is entitled to the land, covered with water in front of his bank, to the middle thread of the river

[Cited in Bowman v. Wathen, Case No. 1,740; Stillman v. White Rock Manuf'g Co., Id. 13,446.]

[Cited in Fletcher v. Phelps, 28 Vt. 262. Cited in brief in Pratt v. Lamson, 2 Allen, 291.]

---

1 [Reported by William P. Mason, Esq.]

2. In virtue of this ownership he has a right to the use of the water flowing over it in. its natural current, without diminution or obstruction. But he has no property in the water itself.

[Cited in brief in Adams v. Barney, 25 Vt. 229; Chatfield v. Wilson, 28 Vt. 53. Cited in Clinton v. Myers, 46 N. Y. 516; A. C. Conn Co. v. Little Suamico Lumber Manuf'g Co., 74 Wis. 657, 43 N. W. 661; Corning v. Troy Iron & Nail Factory, 40 N. Y. 204; De Witt v. Harvey, 4 Gray, 500; Elliot v. Fitchburg R. Co., 10 Cush. 196; Ferrea v. Knipe, 28 Cal. 344. Cited in brief in Hough v. Patrick, 26 Vt. 439; Mayor, etc. v. Commissioners of Spring Garden, 7 Pa. St. 355. Cited in Smith v. City of Rochester, 92 N. Y. 480; Sweet v. City of Syracuse, 129 N. Y. 335, 27 N. E. 1081, 29 N. E. 289; Watuppa Reservoir Co. v. Fall River, 147 Mass. 554, 18 N. E. 465; Whitney v. Wheeler Cotton-Mills (Mass.) 24 N. E. 778.]

3. Every proprietor may use the water as it flows. according to his pleasure, if the use be not to the prejudice of any other proprietor.

[Cited in Union Mill & Mining Co. v. Dangberg, Case No. 14,370.]

[Cited in brief in Barre Water Co. v. Carnes, 65 Vt. 627, 27 Atl. 609. Cited in Davis v. Getchell, 50 Me. 605; Evans v. Merriweather, 3 Scam. 494; Farrell v. Richards, 30 N. J. Eq. 515. Cited in brief in Funk v. Haldeman, 53 Pa. St. 235. Cited in Garrett v. McKie, 1 Rich. Law, 444; Garwood v. New York Cent. & H. R. R. Co., 83 N. Y. 405; Lancey v. Clifford, 54 Me. 490. Cited in brief in Merrifield v. Lombard, 13 Allen, 17. Cited in Patten v. Marden, 14 Wis. 479; Pinney v. Luce, 44 Minn. 370, 46 N. W. 563; Pixley v. Clark, 35 N. Y. 525; People v. Bennett, 29 Mich. 452; State v. Pottmeyer, 33 Ind. 405; Weiss v. Oregon Iron & Steel Co. (Or.) 11 Pac. 258.]

4. There is no difference, whether a proprietor be above or below another in the river, for no right is acquired or lost by any such circumstance. No proprietor has a right to throw backwater on a proprietor above, or to divert it from a proprietor below, to his injury.

[Cited in Webb v. Portland Manuf'g Co., Case No. 17,322; Dexter v. Providence Aqueduct Co., Id. 3,864; Whipple v. Cumberland Manuf'g Co., Id. 17,516.]

[Cited in Cowles v. Kidder, 24 N. H. 378; Lawson v. Mowry, 52 Wis. 236, 9 N. W. 280; Reno Smelting, Milling & Reduction Works v. Stevenson (Nev.) 21 Pac. 318; Stein v. Burden, 29 Ala. 127. Cited in brief in Woodbury v. Short, 17 Vt. 388.]

5. Priority of occupancy of the flowing water of a river creates no right, unless the appropriation be for a period, which the law deems a presumption of right.

[Cited in brief in Arbuckle v. Ward, 29 Vt. 51. Cited in Davis v. Fuller, 12 Vt. 189; Evans v. Merriweather, 3 Scam. 494; Lux v. Haggin, 69 Cal. 392. 10 Pac. 754; Odiorne v. Lyford, 9 N. H 513; Whitney v. Wheeler Cotton-Mills, 151 Mass. 107, 24 N. E. 774.]

6. The exclusive use of flowing water for twenty years, is a conclusive presumption of a right.

7. A mill-owner, as such, has no right to the water of a river, beyond what has been legally appropriated to his mill by title or long use.

[Cited in Webb v. Portland Manuf'g Co., Case No. 17,322.]

[Cited in Buddington v. Bradley, 10 Conn. 218. Cited in brief in Edson v. Munsell, 10 Allen, 559. Cited in Lehigh Val. R. Co. v. McFarlan, 43 N. J. Law, 619; Leonard v. Leonard, 7 Allen, 282; Prudden v. Lindsley, 29 N. J.

Eq. 618; Watkins v. Peck, 13 N. H. 367–377; Williams v. Nelson, 23 Pick. 143.]

8. The riparian proprietors have a title to all the water not so appropriated.

[Cited in Swett v. Cutts, 50 N. H. 444.]

9. Of the nature and effect of presumptions arising from use of water, as to pre-eminent or prior use, in case of a deficiency to supply all concerned.

[Cited in Scheuber v. Held, 47 Wis. 352, 2 N. W. 783.]

Bill in equity [by Ebenezer Tyler and others against Abraham Wilkinson and others] to establish the right of the plaintiffs to a priority of use of the waters of Pawtucket river, &c. The cause was argued at great length, by Whipple and Webster, for plaintiffs, and by Cozzens and Searle, for defendants, at the last November term, and continued for advisement to this term when the following opinion was delivered.

STORY, Circuit Justice. This is a very important case, complicated in facts, and voluminous in testimony. It will not, however, be necessary to go over the details of the proofs, or even of the arguments, urged at the bar, further than may serve to explain the opinion of the court, and give a clear understanding of the points in controversy.

The river Pawtucket forms a boundary line between the states of Massachusetts and Rhode Island, in that part of its course where it separates the town of North Providence from the town of Seekonk. It is a fresh water river, above the lower falls between these towns, and is there unaffected by the ebb or flow of the tide. At these falls there is an ancient dam, called the lower dam, extending quite across the river, and several mills are built near it, as well on the eastern as on the western side of the river. The plaintiffs, together with some of the defendants, are the proprietors in fee of the mills and adjacent land on the eastern bank, and either by themselves or their lessees are occupants of the same. The mills and land adjacent, on the western bank, are owned by some of the defendants. The lower dam was built as early as the year 1718, by the proprietors on both sides of the river, and is indispensable for the use of their mills respectively. There was previously an old dam on the western side, extending about three quarters of the way across the river, and a separate dam for a saw-mill on the east side. The lower dam was a substitute for both. About the year 1714 a canal was dug, or an old channel widened and cleared on the western side of the river, beginning at the river a few rods above the lower dam, and running round the west end thereof, until it emptied into the river about ten rods below the same dam. It has been long known by the name of "Sergeant's Trench," and was originally cut for the passage of fish up and down the river; but having wholly failed for this purpose, about the year 1730 an anchor-mill and dam were built across it by the then proprietors

of the land; and between that period and the year 1790, several other dams and mills were built over the same; and since that period more expensive mills have been built there, which are all owned by some of the defendants. About thirty years before the filing of the bill, to wit, in 1792, another dam was built across the river at a place above the head of the trench, and about 20 rods above the lower dam; and the mills on the upper dam, as well as those on Sergeant's trench, are now supplied with water by proper flumes, &c. from the pond formed by the upper dam. The proprietors of this last dam are also made defendants.

Without going into the particulars of the bill (for in consequence of intervening deaths and devises, the cause is now before the court upon a supplemental bill, in the nature of a bill of revivor), it is necessary to state, that the bill charges, that the owners of Sergeant's trench are entitled, as against the owners of the lower dam, only to what is called a wastewater privilege, that is, to a right to use only such surplus water, as is not wanted by the owners of the lower dam and lands for any purposes whatever. In other words, that the right of the owners of Sergeant's trench is a subservient right to that of the plaintiffs, and takes place only as to any water which the plaintiffs may not, from time to time, have any occasion to use for any mills erected, or to be erected, by them. It charges a fraudulent combination between the owners of the upper dam and Sergeant's trench, injuriously to appropriate and use the water, and that the latter appropriate a great deal more water than they are entitled to by ancient usage, and waste the water to the injury of the plaintiffs. The object of the bill is to establish the right of the plaintiffs, and to obtain an injunction and for general relief.

The principal points, which have been discussed at the bar, are, first, what is the nature and extent of the right of the owners of Sergeant's trench; and, secondly, whether that right has been exceeded by them to the injury of the plaintiffs.

Before proceeding to an examination of these points, it may be proper to ascertain the nature and extent of the right, which riparian proprietors generally possess, to the waters of rivers flowing through their lands. Unless I am mistaken, this will relieve us from a great portion of the difficulties which incumber this cause, and lead us to a satisfactory conclusion upon its merits. I shall not attempt to examine the cases at large, or to reconcile the various dicta, which may be found in some of them. The task would be very onerous; and I am not aware that it would be very instructive. I have, however, read over all the cases on this subject, which were cited at the bar, or which are to be found in Mr. Angell's valuable work on water courses, or which my own auxiliary researches have enabled me to reach. The general principles, which they contain and sup-

port, I do not say in every particular instance, but with a very strong and controlling current of authority, appear to me to be the following.

Primâ facie every proprietor upon each bank of a river is entitled to the land, covered with water, in front of his bank, to the middle thread of the stream, or, as it is commonly expressed, usque ad filum aquæ. In virtue of this ownership he has a right to the use of the water flowing over it in its natural current, without diminution or obstruction. But, strictly speaking, he has no property in the water itself; but a simple use of it, while it passes along. The consequence of this principle is, that no proprietor has a right to use the water to the prejudice of another. It is wholly immaterial, whether the party be a proprietor above or below, in the course of the river; the right being common to all the proprietors on the river, no one has a right to diminish the quantity which will, according to the natural current, flow to a proprietor below, or to throw it back upon a proprietor above. This is the necessary result of the perfect equality of right among all the proprietors of that, which is common to all. The natural stream, existing by the bounty of Providence for the benefit of the land through which it flows, is an incident annexed, by operation of law, to the land itself. When I speak of this common right, I do not mean to be understood, as holding the doctrine, that there can be no diminution whatsoever, and no obstruction or impediment whatsoever, by a riparian proprietor, in the use of the water as it flows; for that would be to deny any valuable use of it. There may be, and there must be allowed of that, which is common to all, a reasonable use. The true test of the principle and extent of the use is, whether it is to the injury of the other proprietors or not. There may be a diminution in quantity, or a retardation or acceleration of the natural current indispensable for the general and valuable use of the water, perfectly consistent with the existence of the common right. The diminution, retardation, or acceleration, not positively and sensibly injurious by diminishing the value of the common right, is an implied element in the right of using the stream at all. The law here, as in many other cases, acts with a reasonable reference to public convenience and general good, and it is not betrayed into a narrow strictness, subversive of common sense, nor into an extravagant looseness, which would destroy private rights. The maxim is applied, "Sic utere tuo, ut non alienum lædas."

But of a thing, common by nature, there may be an appropriation by general consent or grant. Mere priority of appropriation of running water, without such consent or grant, confers no exclusive right. It is not like the case of mere occupancy, where the first occupant takes by force of his priority of occupancy. That supposes no ownership already existing, and no right to the use already acquired. But our law annexes to the riparian proprietors the right to the use in common, as an incident to the land; and whoever seeks to found an exclusive use, must establish a rightful appropriation in some manner known and admitted by the law. Now, this may be, either by a grant from all the proprietors, whose interest is affected by the particular appropriation, or by a long exclusive enjoyment, without interruption, which affords a just presumption of right. By our law, upon principles of public convenience, the term of twenty years of exclusive uninterrupted enjoyment has been held a conclusive presumption of a grant or right. I say of a grant or right; for I very much doubt, whether the principle now acted upon, however in its origin it may have been confined to presumptions of a grant, is now necessarily limited to considerations of this nature. The presumption is applied as a presumption juris et de jure, wherever by possibility a right may be acquired in any manner known to the law. Its operation has never yet been denied in cases where personal disabilities of particular proprietors might have intervened, such as infancy, coverture, and insanity, and where, by the ordinary course of proceeding, grants would not be presumed. In these, and in like cases, there may be an extinguishment of right by positive limitations of time, by estoppels, by statutable compensations and authorities, by elections of other beneficial bequests, by conflicting equities, and by other means. The presumption would be just as operative as to these modes of extinguishment of a common right as to the mode of extinguishment by grant.

These are the general principles, which appear to me applicable to the present case. They will be found recognised in many cases; but are in none more fully and accurately weighed and discussed than in Bealey v. Shaw, 6 East, 208; Williams v. Morland, 2 Barn. & C. 910; and Wright v. Howard, 1 Sim. & S. 190,—in England; and in Ingraham v. Hutchinson, 2 Conn. 584; Merritt v. Parker, 1 Coxe [1 N. J. Law], 460; Palmer v. Mulligan, 3 Caines, 307; Platt v. Johnson, 15 Johns. 213; and Merritt v. Brinkerhoff, 17 Johns. 306,—in America.

With these principles in view, the general rights of the plaintiffs cannot admit of much controversy. They are riparian proprietors, and, as such, are entitled to the natural flow of the river without diminution to their injury. As owners of the lower dam, and the mills connected therewith, they have no rights beyond those of any other persons, who might have appropriated that portion of the stream to the use of their mills. That is, their rights are to be measured by the extent of their actual appropriation and use of the water for a period, which the law deems a conclusive presumption in favor of rights of this nature. In their character as mill-owners, they have no title to the flow of the

stream beyond the water actually and legally appropriated to the mills; but in their character as riparian proprietors, they have annexed to their lands the general flow of the river, so far as it has not been already acquired by some prior and legally operative appropriation. No doubt, then, can exist as to the right of the plaintiffs to the surplus of the natural flow of the stream not yet appropriated. Their rights, as riparian proprietors, are general; and it is incumbent on the parties, who seek to narrow these rights, to establish by competent proofs their own title to divert and use the stream.

And this leads me to the consideration of the nature and extent of the rights of the trench owners. There is no doubt, that in point of law or fact, there may be a right to water of a very limited nature, and subservient to the more general right of the riparian proprietors. It may arise from grant, and be affected by any considerations, conditions, and modifications, which the assent of the parties may impose; and where no such grant is established by written instruments, it may be inferred, like other grants, from long usage, and be governed by the limitations of that usage. The case of Bateson v. Green, 5 Term R. 411, is certainly good law; but it introduces no new principle. The doctrine of subservient rights and uses is probably as old as the common law itself. But in questions of usage, the fact, how much water has been actually used, is not always decisive of the nature and extent of the right. Nor are occasional interruptions of the use, under peculiar circumstances, conclusive of a superior right to control and limit the entire use, to suspend it at pleasure, or destroy it at discretion. The nature and object and value of the use are very material ingredients to explain and qualify the effect of such interruptions. It is not, for instance, to be presumed, that valuable mills will be erected to be fed by an artificial canal from a river, and the stream be indispensable for the support of such mills, and yet, that the right to the stream is so completely lodged in another, that it may be cut off, or diminished, or suspended at pleasure; but, if there should not be water enough for the progressive wants of all, the riparian proprietor should reserve to himself the power of future appropriation for his own exclusive use. In such cases, reasonable presumption must be made from acts in their own nature somewhat equivocal and susceptible of different interpretations. The interruptions may arise from resistance to an attempt by the canal-owner to extend the reach of his dam farther into the river for the purpose of appropriating more water, or from a desire to prevent undue waste, in dry seasons, to the injury of the riparian proprietor. But the presumption of an absolute and controlling power over the whole flow, a continuing power of exclusive appropriation from time to time, in the riparian proprietor, as his wants or will may influence his choice,

would require the most irresistible facts to support it. Men who build mills, and invest valuable capital in them, cannot be presumed, without the most conclusive evidence, to give their deliberate assent to the acceptance of such ruinous conditions. The general presumption appears to me to be that which is laid down by Mr. Justice Abbott in Saunders v. Newman, 1 Barn. & Ald. 258: "When a mill has been erected upon a stream for a long period of time, it gives to the owner a right, that the water shall continue to flow to and from the mill in the manner in which it has been accustomed to flow during all that time. The owner is not bound to use the water in the same precise manner, or to apply it to the same mill; if he were, that would stop all improvements in machinery. If, indeed, the alterations made from time to time prejudice the right of the lower mill (i. e. by requiring more water), the case would be different."

In this view of the matter, the proprietors of Sergeant's trench are entitled to the use of so much of the water of the river as has been accustomed to flow through that trench to and from their mills (whether actually used or necessary for the same mills or not), during the twenty years last before the institution of this suit, subject only to such qualifications and limitations, as have been acknowledged or rightfully exercised by the plaintiffs as riparian proprietors, or as owners of the lower mill-dam, during that period. But here their right stops; they have no right farther to appropriate any surplus water not already used by the riparian proprietors, upon the notion, that such water is open to the first occupiers. That surplus is the inheritance of the riparian proprietors, and not open to occupancy.

The question, then, resolves itself into a matter of fact:—What has been the quantity accustomed to flow in the trench, and what the qualifications and limitations accompanying the flow during this period? It appears to me most manifest from the general current of the evidence, that the trench proprietors do not hold a mere waste-water privilege in the sense which the plaintiffs attribute to those terms. It would be almost incredible, that a priority of right should be reserved to the plaintiffs, as riparian proprietors, to use the water of the stream for any new mills to be erected from time to time by them, so as to entitle them, at their choice, to divert the whole from the trench. Nothing but the clearest proofs could establish such a right, going, in the event, to the complete destruction of the mills erected on the trench. So far from such a pre-eminent right, as it is called, being justified by the evidence, it appears to me to be encountered by it at almost every step. The acts of the parties, at the different periods of their ownership, are irreconcilable with such a supposition. The answers of the defendants positively deny it. The most that can be

pretended from any portion of the evidence is, that the proprietors of the mills on the lower dam did in dry seasons, when the water was scant, remove the temporary dams erected by the trench proprietors, to gain at those periods an additional supply of water. But these acts of interruption seem confined to the temporary dam so erected, and not designed as interruptions of the ordinary flow of the water by means of the permanent dam, or otherwise, into the trench. And what is very material, they were interruptions for the purpose of supplying their mills, then existing on the lower dam, with water. If, therefore, we give the fullest effect to this assertion of pre-eminent right, it must be limited, as it was exercised, to the uses of the mills then in existence, that is, to the usual priority of supply, which, in a conflict of right and a deficiency of water, they were accustomed to take and require. Such a pre-eminent right, founded merely in usage, for particular mills, must be confined to those mills, and cannot be admitted as proof of a general unlimited right over all the water for all future mills. If the trench owners could only claim a waste-water privilege, it was of waste-water not then appropriated or used by existing mills. In this view of the case, it would not help the plaintiffs; for it is not shown, that the old mills would have sustained any injurious loss of water if no new mills had been built by the plaintiffs, requiring a further supply. But it cannot be disguised, that even this claim of right, so limited, has many difficulties to encounter. There is no uniform, clear, decisive evidence to support it. The evidence is contradictory, or inconclusive. There has been no acquiescence in the acts of interruption of such an unequivocal nature and for such a period, as would justify the court to infer any admission of right by the trench owners, or any original reservation on the part of the plaintiffs. On the contrary, the matter of right seems always to have been in contestation. The most that the court can say, is, that the claim of pre-eminent right is suspended in doubt; and that it ought not, under such circumstances, to give relief against the positive denials of the owners.

My opinion accordingly is, that the trench owners have an absolute right to the quantity of water which has usually flowed therein, without any adverse right on the plaintiffs to interrupt that flow in dry seasons, when there is a deficiency of water. But the trench owners have no right to increase that flow; and whatever may be the mills or uses, to which they may apply it, they are limited to the accustomed quantity, and may not exceed it.

What that quantity is, has not been ascertained by any precise admeasurement. The trench owners in their answer do not pretend, that they have acquired any new rights by an additional uninterrupted use within the last twenty years. On the contrary, they assert, that the quantity which now flows, is in conformity to the ancient usage, and does not exceed it. They assert, "that the present gate-hole, which leads the water from the said great flume [of the upper dam] into said trench, is about four feet wide, and fifteen or sixteen inches deep; that the said gate-hole was made about one year after said upper dam was built, and that the diversions thereof have never been altered from the time the same was first made, as aforesaid, to the present time." If the fact be so, it furnishes some elements for a very correct admeasurement of their rights. The principal difficulty in applying it as an absolute measure, arises from the fact of there having been a gate in this gate-hole, put there at the time of the hole itself being made. This gate was removed at least ten years, and more probably from fifteen to twenty years, before the filing of the bill. The plaintiffs insist, that this gate was designed to regulate the quantity of water to which the trench owners were entitled, and was adjusted accordingly. The latter admit the fact of its existence, but assert its removal twenty years ago, and that "it was placed in said gate-hole by the owners of the shops and mills on said trench, and used by them to shut the water out of said trench, while they were repairing the same or the works thereon." It is very difficult to ascertain, from the evidence, whether any positive limitation of right can be deemed to have been originally intended by it. It was hoisted and lowered by the trench owners, as well as by others, occasionally, while it existed, and its removal for a number of years affords some presumption, that it was not deemed a fixed regulator of right. Its height varied at different times according to circumstances; and it is not easy to infer that to be a positive gauge of quantity, agreed on by the parties, which was not immovable in its position.

There was an agreement entered into in the year 1796 between the owners of the upper dam, of the trench, and of the mills on the west side of the river (which is set out in the bill, and admitted by the owners), which has been relied upon by both parties as explanatory of the rights of all concerned. The plaintiffs, and those under whom they claim, were not parties to it; but as matter of evidence, they have themselves relied on it, and complain of it, not on account of its incorrect statement of the matter of right, but of the intentional omission, fairly to carry it into effect. It begins as follows: "Whereas the ancient privilege of Sergeant's trench or the shops thereon, has not been precisely ascertained, and whereas the owners thereof, the owners of the new upper dam, and the owners of the ancient mills at the falls are all interested therein, and in order to make each party right, and make the same as conveniently managed as may be, we, the subscribers, covenant and agree

as follows: The owners of the upper dam hereby convey to the owners of the shops below a full and free liberty of passing and repassing on their land to the gate, when they think proper, for the regulating the water according to their right in the same. And the owners of the works below the falls have the same liberty to shut or hoist said gate for the same purpose, in as full manner as ever heretofore, by custom, usage, or contracts. And to prevent any difficulty about ascertaining the proportion of water fully due and belonging to said trench works, it is mutually agreed, that Benjamin Cozzens, Jr. and Stephen Jenks, Jr. be and are hereby chosen to regulate and ascertain the same; and that the owners of the upper dam keep a suitable gate on their flume, suitable for conveying and regulating the said water, at their own expense. And that it is further agreed, that in case the said B. C. and S. J. do not agree, they have power to appoint a third person, two of whom agreeing, to settle the same. And that the ancient usage or quantity of water, which has been accustomed to pass the said trench, be the rule for them to aim at as near as they can, and the mode of settlement, and the quantity they agree upon, be hereafter the mode and quantity for ever. And that the said persons, within one year from the date, ascertain the same; and that they inform the parties, who now agree to make such other writings, as may then appear more descriptive of the mode and quantity, and the same be then recorded, and that the regulating gate be made at the expense of the privilege." Now, the gravamen of the bill is, that this agreement was never carried into effect by any award whatsoever, though the plaintiffs have requested it; but that it was entered into to defraud the plaintiffs, by deluding them into the belief, that the parties intended to secure the ancient privilege of the trench owners, and no more; whereas, under pretence of it, the trench owners have, within twenty years last past, used much more water.

We are then at liberty, as I think, to consider, that the agreement of 1796, in its terms and statements, is adopted by the plaintiffs. In this view it has a most important bearing on the whole case, not only as a document of considerable antiquity, but as one intended to settle rights between parties, all having different interests. Unfortunately, no award was ever made by the arbitrators, they differing in opinion (the one being an owner on the trench and the other an owner on the lower dam) as to the height which the gate ought to be raised in a dry time. The difference seems to have been between one inch and three quarters, and two inches and a half, in the height.

The agreement itself, however, deserves great consideration. In the first place, it states the right of the trench owners in a very strong manner. It admits, and indeed, requires, the arbitrators to allow them "the quantity of water, which has been accustomed to pass to the trench;" and of course it fixes the right by the quantity flowing in the trench, and not by the quantity, which the mills then existing actually required. In the next place, it contains no qualification or limitation of this right, by the slightest allusion to any pre-eminent right or priority of the lower dam mills, in case of a deficiency of water, or otherwise. Yet such an omission, if such a qualification or limitation as is now contended for by the plaintiffs existed, would be almost incredible. The presumption against its existence, connected with the subsequent lapse of time, during which it has not been admitted or acquiesced in, is of itself abundantly cogent and pressing. In the next place, it goes strongly to repel any inference, that the gate, erected in 1794 at the gate hole of the swift flume, was understood by the parties as an absolute measure of the quantity, or had a fixed position to limit the right of the trench proprietors. If it was a fixed gauge, there could have been no reason for an arbitration to ascertain it in 1796, much less would it have been recited in the agreement that it had "not been precisely ascertained." The most that can be properly said, is, that the parties placed it there for their convenience, but not as a positive limitation of right, which neither party was at liberty to alter, if it affected his acknowledged rights injuriously. In the next place, the agreement ascertains, that the right of the trench owners was not, if I may so say, an expanding right, increasing with the uses to which they might choose to appropriate the water of the river; and that, therefore, they had no right to extend their prior appropriation of the water. Their use of the water since that period ought to be referred back to their rights as recognized in 1796, and if any additional quantity has been appropriated in the intervening time (which they deny), that excess is to be deemed, not a matter of adverse claim, but of mere indulgence. In the next place, it is a fair inference from the agreement, that the water, which thus flowed into the trench of right, was ordinarily adequate to the use of all the mills then erected on it. At least, the existing state of things at that period may be taken to be rightful and adequate to the wants of the parties, or some exception would naturally have found its way into the agreement. And this inference is fortified by the deposition of Benjamin Cozzens, Jr. (one of the arbitrators) as well as by the subsequent user by the trench owners. The agreement of 1797, between the owners of the upper dam and the owners of the mills on the west side of the lower dam, for regulating the flumes of the upper dam, so as to secure a proper quantity of water to the lower dam, does not in the slightest degree impugn

these conclusions. The trench owners were not parties to it; but it has an implied reference to the agreement of 1796, and manifestly contemplated a ratification of its stipulations.

The memorandum, indorsed on the deed of Gideon Jenks to Eleazer Jenks in 1781, cannot be admitted as proof of the anterior pre-eminent right contended for by the plaintiffs. In the first place, however operative between the parties, it could not bind the rights of the other trench owners, who were not parties to it. In the next place, it is not in its terms a recognition of any antecedent existing right, but a reservation of a future right. Its effect, in this view, is equivocal; for the reservation of a pre-eminent right may have been a part of the bargain between these particular parties. But what is still more material, the reservation is not to the plaintiffs, or to the owners of the lower dam generally, or to the riparian proprietors, but simply a reservation in favor of the forge mill, then existing on the west side of the river. Its bearing, therefore, on the present case, must be very slight, if in truth it ought to have any bearing at all. The acts of particular owners respecting their own rights cannot be permitted to bind the rights of others, unless they are adopted and acquiesced in, with full knowledge by the other parties in interest. The agreement of 1796 repels any such inference. The fact of the actual flow and use of the water, for a considerable length of time, is proof of a general right; and no limitations are to be presumed, unless such limitations have constantly accompanied the use, and been acquiesced in by those, whose interests were adverse. For a period of forty or fifty years the water did flow into the trench without any known limitation upon it by grant or usage. The acts of interruption, since that time, were either such as referred to the removal of temporary dams, intended to increase the supply, or were under circumstances so questionable, as to leave behind them no clear traces of any admission of right, or uniform acquiescence in them, as just exercises of superior adverse interests.

I pass over any particular examination of the testimony of witnesses on this point, because it is extremely difficult to reconcile it throughout; and it is, in many respects, so loose and uncertain, that the judgment cannot repose upon it with entire confidence. It fails of establishing any solid ground, on which to rest a decree in favour of the plaintiffs of a pre-eminent right to the use of the water.

The conclusion, to which my mind has arrived on this point, is that the owners on Sergeant's trench have a right to the flow of the quantity of water which was accustomed to flow therein antecedent to 1796; that this right is general, and not qualified by any pre-eminent right in the plaintiffs or

the other owners of the lower dam, either as riparian proprietors or otherwise, to the use of the water, in case of a deficiency; that if there be a deficiency, it must be borne by all parties, as a common loss, wherever it may fall, according to existing rights; that the trench proprietors have no right to appropriate more water than belonged to them in 1796, and ought to be restrained from any further appropriation; and that the plaintiffs to this extent are entitled to have their general right established, and an injunction granted.

It is impracticable for the court to do more, in this posture of the case, than to refer it to a master to ascertain, as near as may be, and in conformity with the suggestions in the opinion of the court, the quantity to which the trench owners are entitled, and to report a suitable mode and arrangement permanently to regulate and adjust the flow of the water, so as to preserve the rights of all parties.

In respect to the question of damages for any excess of the use of the water by the trench owners, beyond their right, within six years next before the filing of the bill, I have not thought it my duty to go into a consideration of the evidence. It is a fit subject, either for reference to a master, or for an issue of quantum damnificatus, if either party shall desire it.

The decree of the court is to be drawn up accordingly; and all further directions are reserved to the further hearing upon the master's report, &c. Decree accordingly.