TAMPA WATERWORKS COMPANY, APPELLANT, VS. GEORGE W. CLINE, APPELLEE.

1. The proprietor or owner of land bordering on a surface stream of water flowing in a well-defined channel has, in the absence of any modification of relative rights by contract, legislative grant or prescription, the right to receive the water of the stream from the proprietor above substantially undiminished in quantity and uncorrupted in quality, and this right exists not from any supposed grant or prescription, but *ex jure naturæ* and as an incident to the soil and for the reason that surface streams of flowing water are the gift of Providence, for the benefit of all lands through which they flow, and as such their usufruct is appurtenant to such lands.

2. The right to the benefit and advantage of the water in surface streams flowing in well-defined channels past one owner's land is subject to the similar rights of all the proprietors on the banks of the stream to a reasonable use and enjoyment of a natural bounty, and it is only for an unauthorized and unreasonable use that one proprietor can have a just cause of complaint against another.

3. The benefit and advantage of surface water flowing in well-defined channels to an adjoining land proprietor extends certainly to the supplying natural wants, including the use of the water for domestic purposes of home and farm, such as drinking, washing, cooking or for stock, and a reasonable use of the water for such purposes may be made.

4. The owner of land through which subsurface water, without any distinct, definite and known channel, percolates or filters through the soil to that of an adjoining owner, is not prohibited from digging into his own soil and appropriating water found there to any legitimate purposes of his own, though by so doing the water may he entirely diverted from the land to which it would otherwise naturally have passed; but if subterranean water has assumed the proportions of a stream flowing in a well-defined channel, the owner of the land through which it flows will not be authorized to divert it, pollute it, or improperly use it, any more than if the stream ran upon the surface in a well-defined course.

Tampa Waterworks Co. v. George W. Cline.—Statement of Case.

5. The only difference in the application of the law to surface and subsurface streams is in ascertaining the character of the stream. If it does not appear that the waters which come to the surface are supplied by a definite flowing stream, they will be presumed to be formed by the ordinary percolations of water in the soil, such presumption being necessary on account of the difficulty in determining whether the water flows in a channel beneath the soil.

6. A stream or water-course consists of bed, banks and water, and to maintain the right to a water-course it must be made to appear that the water usually flows in a certain direction, and by regular channel, with banks or sides and having a substantial existence, but it need not be shown that the water flows continually, as it may be dry at times.

7. The fact that a corporation was chartered for the purpose of supplying a certain city and its inhabitants with water and is under a contract with the city to supply it and the people therein with water, does not give the corporation any additional rights to use or appropriate the water in a well-defined stream flowing over or through lands of different land owners.

8. Applying the principles of law stated in the foregoing head notes to the facts of the present case the decree of the chancellor dismissing the bill of complaint is affirmed.

Appeal from the Circuit Court for Hillsborough county.

## STATEMENT.

The original bill filed in this case was by the Tampa Waterworks Company against George W. Cline, Sr., and George W. Cline, Jr., and subsequently an amended bill was filed against George W. Cline, Sr.—the junior having died in the meantime.

From the amended bill it appears that the Waterworks Company is a Florida corporation organized for the purpose of furnishing the city of Tampa with water for fire, sanitary and domestic purposes, and was under a contract with the city to furnish it, for the

term of thirty years, with abundant supply of good water for the purposes mentioned and for all purposes. That in order to carry out said contract the corporation had acquired the title in fee to lots six and seven in block 23, in the first addition to Highland Park, in the south half of lot one, section 13, township 29 S., range 18 E., according to the plan and map made by Brown and Swingley, and made an exhibit to the bill. That said lots were originally a part of a much larger tract of land owned by one James T. Magbee, deceased, and that his heirs and distributees had laid off said tract into lots and blocks, with streets and alleys, all within the corporate limits of the city of Tampa. That said lot six has issuing from underneath the ground thereon a natural spring of water, which is supplied by a well-marked and defined subterranean stream coming from the east, and flowing underneath the ground twelve or fifteen feet below the surface on land of defendant and complainant until it issues out of and forms the spring upon said lot six, where it again disappears beneath the surface, but comes out again a few feet from the western boundary of complainant's land and flows thence in a stream in a westernly course to the Hillsborough river, some two hundred feet away. That complainant and those under whom it claims have held the land out of which said spring rises for a period of more than seventeen years during which time it has been highly prized by the owners for the purity of its water, which has been considered good and useful for sanitary and domestic purposes, and if maintained in its present state of purity will continue to be useful, and particularly so to complainant under its obligation to the said city to supply it with water. That defendant George W.

Cline, Sr., with the intention to harrass and injure complainant, had recently, and since complainant purchased its land, acquired title to lots one, eight, nine and ten, in block 23, immediately above complainant's land, and was proceeding to excavate, and had excavated, a large and deep hole on his lot eight, near the eastern boundary of complainant's lot seven, said hole being something like eighteen or twenty feet in circumference, and some twelve or fourteen feet deep, and which penetrates to the water of said subterranean stream.    It is charged that in making said excavation defendant acted wantonly and maliciously, and for the purpose of injuring complainant by polluting the water flowing into said spring, and by diminishing the flow thereof, which object will be accomplished if said excavation is continued or permitted to remain.    Upon information and belief it is charged that defendant intended, if not restrained from doing so, to put up a bathing pool or pools in said stream where said excavation is made, and to use the water in such way as to pollute and diminish the same, with the view to damage complainant, or compel it to purchase the land at an exorbitant price.    That to carry out the contract with the city of Tampa, comprising some eight or ten thousand inhabitants, and growing, it was necessary that complainant be able at all times to obtain a large supply of pure, fresh water, which it could not do, without great expense and trouble, from any other source, and that said spring would furnish the necessary water if kept in its present state of purity and flow.    That complainant had expended large sums of money, and spent much time in drilling a well in said city, but had failed to secure such a flow, or sufficient flow, of water for the purposes mentioned, and it had

been compelled to seek some other source of supply, and that at no other place, except at said spring, could such supply of pure, fresh water be found without going to some fresh water lake, some five miles distant from the city. That if defendant was permitted to go on with said excavation, the waters of the spring now pure and useful for complainant's purposes in supplying the city with water, would become polluted and totally worthless to it, so that the same could not be used by it, nor the people of Tampa, for the purposes for which complainant purchased said land. That said water runs underneath and between a rock formation, the top of which rock is some six feet below the surface, and extends down until said subterranean stream is reached, and without said excavation being made it is not liable to be injured or polluted until it comes out upon complainant's land, but which can and will be thoroughly protected by complainant when its waterworks are put up and established.

The injunction asked for was that defendant be stopped from proceeding with the excavation, and that he be compelled to fill up what had been excavated, in a way not to injure the stream. A temporary injunction as prayed for was granted upon the filing of the original bill.

Defendant answered after the amended bill was filed. The answer alleges that the south half of lot one (1), section 13, township 29 S., range 18 E., belonged for many years to James T. Magbee, who conveyed in 1885 to wife of defendant seven acres in the southeast corner of the lot. That Magbee died seized of the remainder of the lot, which had recently been laid off into lots, blocks and streets. That W. A. Jeter and G. A. Boardman purchased by mesne conveyances

from a distributee of the Magbee estate lots 6 and 7, of block 23, and afterwards sold them to complainant. Afterwards, in July, 1889, defendant purchased from distributees of said estate lots 1, 8, 9 and 10 in block 23, and that he made the purchase in good faith for the purpose of improving and beautifying said lots, and developing their water supply. That soon after acquiring said lots defendant began to excavate out a sink on lot 8, at a point about twenty feet from the alley, and a few feet east of complainant's lot 7, and after removing a large amount of said marl and decayed vegetable matter, came upon a large spring of pure cold water of great use and value to defendant and the estate he had purchased. That defendant also thereby developed a large bed of marl of great value as a fertilizer and for paving roadways and sidewalks, and which defendant hoped would yield him great emolument in helping to defray the expense of cleaning out and beautifying said spring. That the land on the west of the excavation which he was making to improve the spring falls rapidly to the street over two lots of complainant, while that lying east, north and south of the excavation is level, so that when the sand and marl are removed and the excavation is enlarged in a way to open up the sink to its natural edge, no rain falling around the excavation can run into it. That the level of the water in defendant's spring is thirteen feet below the surface of the surrounding country, and about four feet above the water level in the ground, so that the surface water can not come into the spring until the surrounding country becomes fully saturated with water, which can only occur in case of unusual flood, and then the water would come by percolation through the sand and marl into said

spring, but to no greater extent than if said excava-
tion had not been made. That the sand of the coun-
try was course, the top soil spongy, and the under
ground drainage so complete that no water is ever seen
on the surface.

The   *   answer denies that the spring mentioned in
the bill comes out of the ground on complainant's land,
and that defendant has polluted, or intends to pollute,
the water in the stream mentioned. It is denied that
defendant intends to divert said spring from its nat-
ural channel, or that the rays of the sun, and the sur-
face drainage by reason of the excavation, will pollute
said spring. It is also denied that defendant pur-
chased said lots with intent to harrass and injure com-
plainant, or that the excavation was made maliciously
for the purpose of compelling complainant to purchase
the lots mentioned; and the allegations as to the in-
tent of defendant to put bathing houses in the water
in the excavation, and thereby pollute the same, are
denied.

It is alleged that the excavation was made by de-
fendant in good faith for the purpose of enhancing the
value of his own lots, and with the intention of law-
fully using the water; also that complaint's spring is
not supplied by a subterranean stream with a well-de-
fined channel, but was supplied by water coming from
unknown and undefined sources; and that the water
from defendant's spring or excavation comes up from
a great depth under the ground, and from unknown
percolations.

After answer filed a motion was made to dissolve the
injunction, and upon this preliminary hearing there
was a modification of the injunction granted, to the
extent of allowing the defendant to dig to the stream

and take therefrom a reasonable quantity of water as might be necessary for his use, but not to take or divert the water wantonly, or to transport it to another place. The modification also permitted defendant to quarry any stone that he might desire, provided that he did not pollute or injure the water flowing into complainant's spring.

Testimony was subsequently taken, and upon final hearing the bill was dismissed and complainant appealed.

Other facts appear in the opinion.

*Sparkman & Sparkman*, for Appellant.

*W. A. Carter*, for Appellee.

MABRY, C. J.:

The questions arising on the present record involve rights of adjoining land owners to water passing through the land not heretofore discussed by this court. The general subject to rights to water passing over or through lands requires some classification in dealing with the different phrases of rights that may arise. A very well considered case decided in Ohio, and hereafter referred to, classifies the subject as follows: 1. In respect to surface streams which flow in a permanent, distinct and well-defined channel from the lands of one owner to those of another. 2. In respect to surface water—however originating—which, without any distinct or well-defined channel, by attraction, gravitation or otherwise, are shed and pass

38

from the lands of one proprietor to those of another. 3. Subterranean streams which flow in a permanent, distinct and well-defined channel from the lands of one to those of another proprietor. 4. Subsurface water which, without any permanent, distinct or definite channel, percolate in veins or filter from the lands of one owner to the lands of another.

The rights asserted by appellant in the bill filed appertain to the water of a natural spring alleged to be supplied by a well-marked and defined subterranean stream flowing some twelve or fifteen feet below the surface across the lands of appellant and appellee, and the case does not call for a discussion of, and what is said has no application to, mere surface water without any distinct and well-defined channel, and which is shed and passes from the land of one owner to that of another. In the Ohio case mentioned (Frazier vs. Brown, 12 Ohio St. 294), in speaking of flowing surface water in well-defined channels, it is said "that notwithstanding the maxim which affirms the absolute and unlimited dominion of the proprietor of the soil upward and downward, the proprietor below has, in the absence of any modification of relative rights by contract or prescription, no right to throw the water back on him above, and has the right to receive it from the proprietor above substantially undiminished in quantity and uncorrupted in quality; and this right arises, not from any supposed grant or from prescription, but *ex jure naturæ*, and for the reason, that surface streams of flowing water are the gift of Providence, for the benefit of all lands through which they flow, and as such their usufruct is appurtenant to the lands through which they flow." This

statement contains the doctrine of the English common law as clearly announced in adjudications in that country. In the English case of Embrey vs. Owen, 15 Jurist 633, it is stated that "the right to have the stream to flow in its natural state without diminution or alteration is an incident to the property in the land through which it passes, but flowing water is *publici juris*, not in the sense that it is a *bonum vacans* to which the first occupant may acquire an exclusive right, but that it is public and common in this sense only, that all may reasonably use it who have a right of access to it, that none can have any property in the water itself, except in the particular portion which he may choose to abstract from the stream and take into his possession, and that during the time of his possession only. But each proprietor of the adjacent land has the right to the usufruct of the stream which flows through it." Sustaining this view are the following authorities: Wright vs. Howard, 1 Sim. & S. 190; Mason vs. Hill, 5 B. & Ad. 1; Wood vs. Waud, 3 Exch. 748; Dickinson vs. Grand Junction Canal Co., 9 Eng. Law & Eq. 513; Chasemore vs. Richards, 7 H. L. Cases, 349; Tyler vs. Wilkinson, 4 Mason 397; 3 Kents Com. 439; Gould on Waters, sec. 204. The American adjudications to the same effect are numerous. The right to the benefit and advantage of the water flowing past one owner's land is subject to the similar rights of all the proprietors on the banks of the stream to the reasonable enjoyment of a natural bounty, and it is therefore only for an unauthorized and unreasonable use of a common benefit that any one has just cause to complain. Judge Story says, in Tyler vs. Wilkinson, *supra:* "The natural streams,

existing by the bounty of Province for the benefit of the land through which it flows, is an incident annexed, by operation of law, to the land itself. When I speak of this common right, I do not mean to be understood as holding the doctrine that there can be no diminution whatever, and no obstruction or impediment whatever, by a riparian proprietor, in the use of the water as it flows; for that would be to deny any valuable use of it. There may be, and there must be allowed of that, which is common to all, a reasonable use. The true test of the principle and extent of the use is, whether it is to the injury of the other proprietors or not. There may be a diminution in quantity, or a retardation or acceleration of the natural current indispensable for the general and valuable use of the water, perfectly consistent with the existence of the common right. The diminution, retardation, or acceleration, not positively and sensibly injurious by diminishing the value of the common right, is an implied element in the right of using the stream at all. The law here, as in many other cases, acts with a reasonable reference to public convenience and general good, and it is not betrayed with a narrow strictness, subversive of common sense, nor into an extravagant looseness, which would destroy private rights. The maxim is applied, *sic utere tuo ut non alienum laedas.*"

As to the riparian rights to the ordinary use of water flowing past land, it extends to the supplying of natural wants, including the use of the water for domestic purposes of home or farm, such as drinking, washing, cooking or for stock of the proprietor, and many authorities state that if necessary for the pur-

poses mentioned, all the water of the stream may be consumed. Evans vs. Merriweather, 3 Scam. 492, S. C. 38 Am. Dec. 106; Wadsworth vs. Tillotson, 15 Conn. 366, S. C. 39 Am. Dec. 391; Anderson vs. Cincinnati Southern Ry. Co., 86 Ky. 44, 5 S. W. Rep. 49; S. C. 9 Am. St. Rep. 263; Acquackanonk Water Co. vs. Watson, 29 N. J. Eq. 366; Dumont vs. Kellogg, 29 Mich. 420, S. C. 18 Am. Rep. 102; Gould on Waters, sec. 205. There are other uses than those mentioned to which, according to many authorities, flowing water in well-defined and distinct channels may be applied, but the disposition of the present case does not require a further statement as to the rights of adjoining proprietors to running surface water in well-defined channels over their lands.

In reference to rights in subsurface water, there is apparent a contrariety of judicial opinion, as might be expected from the inherent difficulty of ascertaining definitely the character and extent of the right asserted. In the case of Acton vs. Blundell, 12 Meeson & W. 324, the plaintiff was the owner of factory mills supplied by water from wells sunk into the ground, and it was alleged that plaintiff used the water of certain underground springs streams and watercourses which had run, flowed and percolated into the wells, and the breach was that the defendant had sunk divers pits, shafts, holes and tunnels near the premises of plaintiff, by means whereof the water to the wells had been diverted and they had become dry. It was held that the owner of land through which water flows in a subterranean course, has no right or interest in it which will enable him to maintain an action against a land owner, who, in carrying on mining

operations on his own land in the usual manner, drains away the water from the land of the first mentioned owner and lays his well dry. In the opinion it was said, upon a consideration of the grounds and origin of the law controlling running surface streams and the consequences that would result if the same law was made applicable to streams beneath the surface, that there was a marked difference between the two cases, and they were not governed by the same rule of law. The opinion points out the difference between surface streams where each man can know what he receives from the lands above, and what he transmits below, and of hidden and unknown supplies of water of which he has no knowledge and can not be informed except by actual test in digging. The consequences that would result from the doctrine that one landowner can not appropriate in any proper way the unknown sources of spring water on his land, are also pointed out.

As we construe this case from its facts it had no reference to a subterranean stream with a marked and well-defined channel, but was dealing with subsurface percolating water.

The case of Dickinson vs. Grand Junction Canal Co., already cited, goes a long ways in opposition to the ruling in Acton vs. Blundell. It holds that the diversion of water from a well-defined surface watercourse though never forming a part of the stream, but was prevented from doing so in its natural course, by means of an excavation, was actionable, and that this was the case whether the water was part of an underground water course or percolated through the earth. The ruling in Dickinson vs. Grand Junction Canal Co.,

in the particular mentioned, has, however, been repudiated in the case of Chasemore vs. Richards, 7 H. L. Cases, 349. It was there held that the principles which regulate the rights of owners of land in respect to water flowing in known and defined channels, whether upon or below the surface of the ground, do not apply to underground water which merely percolates through the strata in unknown channels. The case of Wheatley vs. Baugh, 25 Penn. St. 528, S. C. 64 Am. Dec. 721, has generally been regarded as containing a thorough consideration of the subject. The owner of a tan yard had a spring of water upon land where the tannery was established and the water used in the business. A copper mine was discovered on the adjacent farm and a shaft sunk some five hundred and fifty feet from the tan-yard, by reason of which the water flowing to the spring was diverted. There was no showing, as appears from the case, that the spring was supplied with water other than that percolating from the land of the one party to the other. It was held that the owner of the tan-yard could not recover for the diversion of the water from the spring. It was, however, held in this case that where a subterranean flow of water has become so well-defined as to constitute a regular and constant stream, the owner of the land above, through which it flows, may not divert or destroy it, to the injury of the person below, on whose land it issues in the form of a spring. It is said in the opinion that "in limestone regions streams of great volume and power pursue their subterranean courses for great distances, and they emerge from their caverns, furnishing power for machinery of every description, or supplying towns and settlements with

water, for all the purposes of life. To say that these streams might be obstructed or diverted, merely because they run through subterranean channels, is to forget the rights and duties of man in relation to flowing water. But to entitle a stream to the consideration of the law, it is certainly necessary that it be a *water course*, in the proper sense of the term.  * * * When the filtrations are gathered into sufficient volume to have an appreciable value, and flow into a clearly defined channel, it is generally possible to see it, and to avoid diverting it without serious detriment to the owner of the land through which it flows. But percolations spread in every direction through the earth, and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land. Accordingly the law has never gone so far as to recognize in one man a right to convert another's farm to his own use, for the purpose of a filter.'' The views expressed in this case as to subterranean streams have been characterized as *obiter. dicta* (Frazier vs. Brown, *supra*), but a consideration of the authorities applicable leads us to the following conclusions as general statements of the rules governing subsurface water: That the owner of the land through which subsurface water, without any distinct, definite and known channel, percolates or filters through the soil to that of another, is not prohibited from digging into it and appropriating it to any useful purpose of his own, though by so doing the water may be entirely diverted from the land to which it would otherwise naturally pass. On the contrary, if subterranean water has assumed the proportions of a well-defined and constant stream, the owner of the land through

which it flows will not be authorized to divert it, or improperly use it, any more than if the stream ran upon the surface. The only difference in the application of the law to surface and subterranean streams will be in ascertaining the character of the streams. What is on the surface can be seen, but that which is under the ground can not be so readily ascertained, and of course there will be more difficulty in establishing it. Mr. Gould states (sec. 281) that "if underground currents of water flow into defined and known channels, the rules of law which govern the use of similar streams flowing upon the surface of the earth are applicable to them, but if it does not appear that the waters which come to the surface are supplied by a definite flowing stream, they are presumed to be formed by the ordinary percolations of water in the soil. Some such presumption is necessary on account of the difficulty of determining whether the water flows in a channel, but in all other respects there appears to be no distinction between subterranean waters and those upon the surface." The American decisions bearing upon the point are too numerous to discuss in an opinion, and while they, with few exceptions, recognize the principles we have stated, there are extreme applications of them to cases that have arisen. In addition to the authorities cited, we refer to the following as bearing on the subject: Kauffman vs. Griesemer, 23 Penn. St. 407, S. C. 67 Am. Dec. 437; Whetstone vs. Bowser, 29 Penn. St. 59; Haldeman vs. Bruckhart, 45 Penn. St. 514, S. C. 84 Am. Dec. 511; Pennsylvania Coal Company vs. Sanderson, 113 Penn. St. 126, 6 Atl. Rep. 453; Collins vs. Chartiers Valley Gas. Co., 131 Penn. St, 143, 18 Atl. Rep. 1012; Bur-

roughs vs. Saterlee, 67 Iowa, 396, 25 N. W. Rep. 808; Hinkle vs. Avery, 88 Iowa, 47, 55 N. W. Rep. 78; Hanson vs. McCue, 42 Cal. 303, S. C. 10 Am. Rep. 299; Hale vs. McLea, 52 Cal. 578; Strait vs. Brown, 16 Nev. 317, S. C. 40 Am. Rep. 497; Chatfield vs. Wilson, 28 Vt. 49; Hoxsie vs. Hoxsie, 38 Mich. 77; Upjohn vs. Board of Health, 46 Mich. 542; Ulbricht vs. Eufaula Water Co., 86 Ala. 587, 6 South. Rep. 78; Case vs. Hoffman, 84 Wis. ——, 54 N. W. Rep. 793.

"A water course consists of bed, banks and water; yet the water need not flow continually; and there are many water-courses which are sometimes dry." Angell on Water-courses, sec. 4. It is stated in Ashley vs. Wolcott, 11 Cush. 192, that "to maintain the right of a water course or brook, it must be made to appear that the water usually flows in a certain direction, and by a regular channel, with banks or sides. It need not be shown to flow continually; it may be dry at times, but it must have a well-defined and substantial existence." In dealing with sub-surface streams their situation and character must, of course, be kept constantly in view.

In applying the principles announced to the facts of the present case we must state conclusions, as the evidence is too voluminous to be discussed in detail in the opinion. The mere fact that appellant has a contract with the city of Tampa to supply its inhabitants with water, and has expended large sums of money in the erection of a plant does not confer any additional rights to the water that passes through appellee's land. City of Emporia vs. Soden, 25 Kansas, 588, S. C. 37 Am. Rep. 265; Acquackanonk Water Co. vs. Watson, 29 N. J. Eq. 366. There is also no question presented

as to priority of right growing out of contract, prescription or legislative grant. The tract of land through which the water in question runs belonged for many years to James T. Magbee, and after his death, some time during the year 1888, his heirs and distributees had it platted into lots, blocks and streets, which are now within the corporate limits of the city of Tampa. Appellant, through mesne conveyances, acquired title to lots six and seven of the plat in the early part of 1889, and a few months thereafter appellee purchased lots one, eight, nine and ten, which were immediately east or north-east of appellant's lots. The formation of the land twelve or fifteen feet below the surface, and in which the water is found, is of a limestone character. There is some diversity of opinion among the witnesses as to the character of the rock in contact with the water. One of the appellant's witnesses, an expert, states that the rock in contact with the water was stratified, and away from it was in boulders lying in detached lumps. Considering all the evidence there is no doubt that the land is underlaid with rock of a limestone formation. Issuing from the Magbee tract of land not far from the Hillsborough river was a bold spring of constantly flowing water, known as "Magbee spring," and the plat located this spring in a street or avenue. The lots purchased by appellant were east and north-east and nearest to the spring. From the spring east and north-east across the lots of both parties there were surface depressions or sinks, such as mark the course of subterranean streams in limestone regions. On one of appellant's lots a sink went down so that the water below could be seen, and at or near this point the company's water-works for supplying

the city with water were established. A deep shaft was dug and a reservoir made to receive the water running in an underground stream, and it is an alleged diversion and disturbance of this water supply that caused the company to complain. Appellant commenced to excavate first, but changed locations. Before the second excavation for the reservoir was commenced appellee began an excavation in a sink on one of his lots a short distance away, and had reached a stream of running water when the injunction was served on him. From the evidence in the record we are satisfied that the stream reached by appellee in his excavation extends to the reservoir of appellant. The source of this stream is left in speculation, without definite proof, but from all that is shown we are of the opinion that this is a well-defined subterranean stream flowing through the lands of both parties. There is some diversity of opinion among the expert witnesses examined by appellant as to the course and limits of the stream. From "Magbee spring," where the stream issues from the ground, to the Hillsborough river, the banks are twenty or more feet wide, and one expert states that the stream above covers an equal space in circuit; while another was of the opinion that it covered a much larger space, and was probably supplied by several lateral streams converging at the point where the reservoir of appellant was located. The depressions and surface indications in a direct line over the lands of the parties, and for some distance further east, indicate a sub-surface stream as found in limestone formations. The capacity of this stream at the reservoir, not more than one hundred and seventy-five feet from appellee's excavation, is between two and a half and three millions gallons of water per day, and

fresh water fish from six to ten inches long were discovered in both excavations. The water when muddied or colored with analine dyes in appellee's shaft showed in a very short time in the one below, and from such evidence of a well-defined stream taken in connection with that of the experts we do not doubt that it does exist. The rule as to well-defined surface streams must, therefore, be applied to the stream in question. Appellee has the right to the use of this water as much as if it ran upon the surface of the ground. He can not divert it or pollute it, but he may open up a water supply on his own land so as not to interfere with the legal rights of adjoining owners, and also make a reasonable application of the water, certainly for domestic purposes. We discover no reasonable objection to the improvement of his own property by the removal of the soil in the depression between the rocks, over the stream and beautifying the place by opening an accessible way to the water. The mere opening of a space so that the rays of the sun can reach the water below will not of itself be a contamination or an unreasonable use of it. It is true that impurities from surface drainage might get into the stream if unprotected and thereby pollute it, but this can be guarded against; and it is the duty of appellee to prevent the surface water from overflowing into the opening made by him. There is no sufficient showing that any serious injury has been done, or will be done with proper precaution, to the stream by reason of the opening. The maxim, *sic utere tuo ut non alienum laedas*, will apply.

We do not see that we can hold, on the showing made, that appellee has diverted the water in the

stream. According to the testimony of the witness Campbell, superintendent of the company, there was a diversion, but Wynn and Boardman, also connected with the company, testify that if the excavation of appellee, and described in the bill of complaint, is left open and untouched it would not affect the quantity of water in the stream. Appellee denies positively that there has been any substantial diversion of the water, and as the burden of proof rests upon appellant, we can not reverse the finding of the chancellor as to a diversion of the stream.

We do not think the testimony shows that appellee acted wantonly and maliciously in making the excavation complained of; at least we are not authorized to reverse a decision on the proofs adverse to appellant on this point. Whether the motive with which the excavation was made, provided it was in the exercise of a legal right, would be a cause for an injunction, we need not consider. We are further satisfied that it is not sufficiently shown that appellee intended to devote his excavation to bathing purposes. There is some testimony that his son stated a bathing pool would be put in the stream in the excavation, and that appellee asserted a right to devote the stream to such uses, but the son is not a party to the present suit, and it does not sufficiently appear that he had any authority to speak for the father. It further appears from the testimony of appellee not contradicted that he informed the agents of appellant before the bill was filed that the stream would not be used for bathing purposes under any circumstances. Relief must always be confined to the allegations of the bill, and an examination will show the allegations of wrong-doing against

appellee are, in substarce, that he with intent to harrass and injure complainant had purchased his lots and had excavated a large and deep hole on one of them that penetrated to the water of the stream; that the excavation was made wantonly and maliciously for the purpose of injuring complainant by polluting the water and by diminishing its flow, and that he intended to put bathing pools in the stream, if not restrained. The excavation referred to in the bill is the one to which we have confined the opinion so far. After the injunction was modified, appellee made other excavations on his lots, and there is considerable testimony in the record in reference to such excavations. The object in making such excavations, as claimed by appellee, was to obtain rock for paving purposes. There is some allusion to the rock as fertilizer, but there seems to be nothing of value in this. It is shown that the rock can be used for paving streets and roads. Appellee, of course, has the right to take rock out of his own land if he desires, provided that in doing so he does not divert or pollute the stream that flows through the land. It is claimed by appellant, and expert testimony was introduced tending to show, that blasting or excavating near the stream would have the effect to cause the rock in contact with it to fall in and thereby divert the channel of the water. The additional excavations are not shown to be over or in immediate contact with the stream, and the character of the communications between them is left in uncertainty. Water was found in such excavations, and it is shown that it has some temporary visible effect upon the water in appellant's reservoir, but whether this is caused by percolations or streams, and if the latter, their character and extent, is left in uncertainty. If

it is not affirmatively shown that subsurface water is supplied by a definite flowing stream, the presumption is that it comes from ordinary percolations. .The testimony is also indefinite as to the character of blasting done or contemplated by appellee, and our conclusion is that the decree should be affirmed on the evidence. While appellee has the right to use the stream in the manner indicated, and may also make such legitimate use of his own property as he pleases, he must do so in a manner not to divert or pollute the stream of water flowing through the same.

On the allegations of the bill and the evidence submitted the decree will be affirmed, and it is so ordered.