CORNING *vs.* GOULD.

The encroachment, by one party, upon a *way* held in common, by building part of the wall of a house upon a portion of it and enclosing another portion within fence, work an *extinguishment* by operation of law ; especially where the other party sells his interest after such acts done, and the purchaser on his part acquiesces in and confirms what has been done.

The acts relied on to show an extinguishment must be such as clearly to indicate an intention to abandon the right to the easement or servitude.

Where a party relinquishes the enjoyment of an easement or servitude, it lays with him to show an *intention to resume* the use of it within a *reasonable time ;* and where there are no circumstances intimating the suspension to be *temporary* only, a *bona fide* purchaser will be protected in the enjoyment of the property *as it appeared* at the time of his purchase.

An *uninterrupted adverse user* of 20 years, in analogy to the statute limiting a right of entry, confers a complete prescriptive *title* to a *way* or other easement or servitude ; and the *extent* of the way is governed by the user.

Where the case is questionable, the usual course is to leave it to the jury to say whether they will *presume a grant ;* but where the fact of adverse possession is beyond dispute, the law itself raises the *presumption.*

A right of way may, however, be abandoned or extinguished.

Abandonment is a simple *non-user* of an easement ; but to establish such an answer to the claim of a right of way, the enjoyment of the right must have *totally* ceased for the *same length of time* that was necessary to create the original presumption.

The *non-user* for 20 years affords a presumption, either that the former presumptive right was *extinguished* in favor of some other adverse right, or if no such adverse right appears, that it has been *surrendered* or never had existence. A mere non-user, *it seems*, is sufficient to produce this effect, without showing the erection, or permission to erect a *permanent obstruction.*

A *permanent obstruction* however, alone by one party, insisted on by the other, operates to *extinguish* all right to the use of a common way, although such obstruction has existed for a period less than 20 years ; and in such case it matters not in an *action on the case* by the party who claims the common right, that the other party has taken into his possession in *severalty* more than he is entitled unto—if he has done so, the remedy is in *trespass quare clausum fregit*, and not by *action on the case.*

THIS was an *action on the case, for obstructing a way*, tried at the Albany circuit in March, 1831, before the Hon. JAMES VANDERPOEL, one of the circuit judges.

The parties are owners of adjoining house lots in the city of Albany, situate on the south side of and facing State street ; and plaintiff's lot lying to the *east* of the defendant's is now known as No. 106—the defendant's lot is known as

No. 108 ; both parties derive title from *Henry Cuyler*, who devised the lots by will, bearing date 21st March, 1689. Lot No. 108 was conveyed by deed under power contained in the will of Henry Cuyler, on the 25th March, 1695, to *Johannes Cuyler*, being described in the deed as being in breadth in front and rear 20 feet, " *with the half of a common alley to the east, breadth 3 feet—all wood measure.*" On the 1st May, 1702, Johannes Cuyler conveyed this lot to *Gerrit Luykass*. Lot No. 106 was conveyed by the representatives of Henry Cuyler to *Abraham Cuyler*, by deed bearing date 8th July, 1703, being described as of the breadth of 20 feet in front and rear, and as being bounded on the west by the lot of *Gerrit Luykass*, " *with the half of a common alley on the west thereof, in company with said Gerrit Luykass—is broad 3 feet.*" The plaintiff deduced a regular paper title to lot No. 106 from Abraham Cuyler, and the defendant a like title to lot No. 108 from Gerrit Luykass. The owners gave a practical construction to the conveyances of these lots, by establishing an alley between them of the *width* of *about six feet*, as it was proved that from 1774 to 1825 there was an alley of about that width between the lots extending south from State street the distance of 33 feet. At the southern termination of the alley, there was a *cedar post* standing in a line with the south end of the house, erected on lot No. 108, at the distance of 3 feet 8 inches from the southeast corner of the house, to which post were attached gates opening into the respective lots. From the cedar post a *division fence* extended south between the two lots. In 1825, Archibald Craig, who was then the owner of lot No. 108, tore down a house which was then upon it, and which had extended back from the street 20 feet, and erected a new house on the lot, which, with a piazza attached to it on the south, extended back from the street 62 feet. The *west* wall of the new house, for the distance of 20 feet south from the street, occupied the same site as the west wall of the old house ; and from the termination of the 20 feet, extended south *in the same range* 35 feet more, and then followed the piazza of the width of 7 feet, making a continuous wall of 62 feet. When his new house

ALBANY,
Jan. 1837.

Corning
v.
Gould.

was finished, *Craig* erected a fence extending north from the *cedar post* to State street; which fence was intended as a *continuation* of the *division fence*, dividing the lots south of the cedar post. But it was not directly on the line; it diverged a little to the west, leaving a space of only 3 feet 7 inches between it and the *east wall* of the house on lot No. 108, whilst at the south end of the fence, i. e. where the *cedar post* stood, the distance between the fence and the house on lot No. 108 was 3 feet 8 inches. The distance between the fence and Craig's house, on State street, was only 19⅝ inches; and at its southern termination i. e. at the distance of 33 feet from State street, it was only 15 inches distant from the wall of Craig's house. It was proved that six feet *wood measure* is equal to only five feet $7\frac{3}{10}$ inches English measure. In 1828, the defendant became the purchaser of No. 108, at a master's sale under a decree in chancery in a partition suit between the heirs of one John B. Visscher, who had died seized of the premises. At the time of the defendant's purchase, there was an old house on the premises which extended south from State street 33 feet, the length of the alley. In 1830, the defendant tore down this house and erected in its place a new house, the *east* wall of which occupies the site of the east wall of the old house for the distance of 33 feet, then there is an offset of 3 feet 8 inches to the east, and then the wall is continued south on the line of the original division fence between the two lots. Whilst the defendant's house was building, he took down the fence which had been erected by Craig in the alley; and after the house was finished, he re-built the fence on the same site where it stood when he took it down: *and for this act of re-building the fence, this action was brought.* The defendant proved that after *Craig* erected the fence in the alley, and both previous and subsequent to the defendant's purchase, a chair maker occupied the house on lot No. 108, and whilst there used the alley west of the fence for piling and storing flags and other materials for the manufacture of chairs. Craig complained of the flags and of rubbish being kept there, and threatened to prosecute the chair maker for thus creating a *nuisance*, but claimed no right *west* of

the fence. The circuit judge held that the parties had a *right in common to the whole of the alley,* and that the plaintiff was entitled to a verdict, and intimated that he would so instruct the jury. To which decision the defendant's counsel excepted. It was then agreed between the parties that the jury should find a verdict for the plaintiff for *six cents damages,* that the defendant should be at liberty to make a *case* to obtain the opinion of this court, and that judgment might be given thereon, as upon a special verdict. A verdict was accordingly entered, and upon a case containing the above facts, the defendant now moves for judgment in his favor, or for a new trial.

*L. H. Palmer & S. Stevens,* for the defendant.

*M. T. Reynolds,* for the plaintiff.

*By the Court,* COWEN, J. Whether the original documental title of those under whom these parties claim, carried a right in severalty to each owner in the soil of one half the alley, it is not now material to inquire; for there is no doubt that the user had fixed the title to a common right of way, long before 1825, when the building of *Craig* was erected. An uninterrupted adverse user of twenty years, in analogy to the statute limiting a right of entry, has long been held to confer a complete prescriptive title to a way or other easement, the extent of which is also to be conclusively governed by the user. *Campbell* v. *Wilson,* 3 East, 294. Per Lord Mansfield, C. J., in *Folkes* v. *Mad,* 3 Doug. 343. *Livett* v. *Wilson,* 3 Bing. 115. 10 Moore, 409. S. C. Per Abbott, C. J., in Doe, dem. *Putland* v. *Hilder,* 2 Barn. & Ald. 791. *Wright* v. *Freeman,* 5 Harr. & Johns. R. 497. *Hill* v. *Crosby,* 2 Pick. 466. *Commonwealth* v. *Low,* 3 Pick. 408. Per Wilde, J., in *Coolidge* v. *Learned,* 8 Pick. 509. 1 Chit. Gen. Pr. 214. These authorities relate particularly to *ways.* There are various methods of meeting, qualifying, and explaining the evidence adduced to establish the user during the twenty years; and where a case the least questionable is made, it

has commonly been the course to leave it to a jury to say whether they will presume a grant. *Campbell* v. *Wilson,* 3 East, 294. *Livett* v. *Wilson,* 3 Bing. 115. 10 Moore, 409. But the fact of adverse enjoyment for twenty years being beyond dispute, the law itself raises the presumption, which is very strong ; and in one case it was even held to be a presumption *juris et de jure*. *Tyler* v. *Wilkinson,* 4 Mason, 397. And see 3 Kent's Comm. 444, 5, 3d ed. The case of *Tyler* v. *Wilkinson* was that of a right arising from twenty years' adverse enjoyment of flowing water ; but this depends on the same general principle with the prescriptive right of way. Upon the authorities cited, and many others, to which it is unnecessary to refer, I entertain no doubt that the learned judge who tried this cause was entirely right in directing a verdict for the plaintiff, *unless* the right of way, so clearly established in the first instance, was afterwards either abandoned or extinguished by the proprietors of lot No. 106 ; and this forms the only serious question in the cause.

*Abandonment* is a simple non-user of an easement ; and in order to make out an effectual answer to the claim upon that ground, I find it perfectly well settled that the enjoyment, nay all acts of enjoyment, must have totally ceased for the same length of time that was necessary to create the original presumption. We are to inquire first, was the way used continuously and adversely for twenty years ? If so, the presumptive title becomes vested. Secondly, has the use, then, been altogether discontinued for twenty years ? If not, there is no abandonment. *Wright* v. *Freeman,* 5 Harr. & Johns. R. 467, 476, 477. *Emerson* v. *Wiley,* 10 Pick. 310. *Cuthbert* v. *Lawton,* 3 M'Cord, 194. On the contrary, if the non-user for the twenty years clearly appear, this affords a presumption either that the former presumptive right was extinguished in favor of some other adverse right ; or, where no such adverse right appears, then simply that the former has been surrendered, or that it never existed. *Prescott* v. *Phillips,* 2 Ev. Poth. 136. Per Lord Erskine, C., in *Hillary* v. *Waller,* 12 Ves. 265. Per Story, J., in *Hazard* v. *Robinson,* 3 Mason, 275, 6. Mr. Evans'

remarks on *Prescott* v. *Phillips,* in 2 Ev. Poth. 136. 3 Kent's Comm. 448, 3d ed. The two latter writers incline with the civil law, to hold that some thing beyond mere non user for the prescriptive term is necessary to work the legal abandonment, such as the erection or permission to erect some permanent obstruction. The doctrine in the English and American cases cited, is otherwise; and, in 1823, the court of appeals, in Maryland, expressly recognized the effect of simple non user. *Wright* v. *Freeman,* 5 Harr. & Johns. R. 467. *Lawrence* v. *Obee,* 3 Campb. 514, S. P. But the inquiry is not important to the case in hand. The non user here was not to exceed four or five years; and the defence stands on a footing entirely independent of prescription.

If there be any defence, it must rest on the ground that the various *permanent obstructions* erected from time to time by the immediate vendor of the plaintiff, and continued by himself, and insisted on by the defendant, operated to extinguish all right to the use of this way as a servitude. If that be so, then the plaintiff's way, as he calls it in his declaration, has not been obstructed. Being extinct, there was nothing left of it as a way; and it is not necessary to inquire whether the fence built by the defendant was or was not over the dividing line, and on the land of the plaintiff, which was the principal ground taken by his counsel at the trial. The remedy for that would be an action of trespass *quare clausum fregit,* if there be any propriety in supposing that the plaintiff can pass the fence erected by his vendor as a dividing line between the soil of the two lots.

There are certainly some things which render the idea of re-opening, not to say resuscitating this way, rather repulsive. In the first place, Craig, the plaintiff's vendor ran the west wall of his large brick building, I mean the thirty-five feet of it which extends south of the old foundation, considerably on to this alley. When I say considerably, I must be understood as speaking comparatively. The way was already so narrow that the plaintiff's witness, Mr. Easton,

said he had great difficulty to use it as a horse way for sleigh loads of wood. The little remnant of an entry of fourteen inches wide between his piazza at the rear of his new house and the old fence, might have served his own turn; of that he had a right to judge. But it came far short of the full half way of three feet which is now so rigidly exacted of his neighbor. Looking at the old partition fence in the rear, which has stood the immemorial representative of the true centre, and which still indicates the full three feet for the west side of the alley, there is some reason to believe that this heavy brick wall is not the *first encroachment* upon that side. Cotemporaneously with the erection of this wall, the workmen of Craig were directed to continue the old fence directly through the ancient centre of the alley to State street; in virtue of which he entered into the exclusive possession on his side, leaving the tenants of the defendant's house to an exclusive occupation on the other. With this, Craig did, on one occasion, interfere; but in such a way, as rather to acknowledge than deny the general exclusive right to the western three feet. On the tenants of the defendant's house depositing offensive articles next the fence, Craig set up no *right of way* or *soil* in himself, but threatened a complaint to the city police as for a public nuisance. Thus having built on the way, and erected a fence through it from one end to the other, the defendant's lot, then belonging to the heirs of Visscher, comes into the market for sale by the master; and the defendant is allowed to purchase and advance his money, without the least intimation that the old state of things was to be restored. It is true that his deed mentions the common way, and professes to convey that as a way; and if not extinct, it was doubtless carried by the deed. Besides, the fence taken down by the defendant was re-erected in the very place where it before stood, and even this was crowded on State street slightly west of a correct range with the old fence in the rear.

The acts of obstruction on the part of the plaintiff, then, or, which is the same in legal effect, on the part of Craig,

ALBANY,
Jan. 1837.

Corning
v.
Gould.

his vendor, come into this short compass: the encroachment by the brick wall, and the running of the fence through the whole length of the way at the centre followed by the *bona fide* purchase of the defendant; and his express and active concurrence in re-building and continuing the fence where Craig had placed it. The great question is, whether these acts, on the part of Craig, indicated a clear intention to give up the passage as a common way; and are of such a nature as, being accompanied with that intention, and followed by the assent of the defendant, work an extinguishment by implication of law. Of the real intention of Craig at the time of building his house and fence, there can hardly be a doubt as the evidence stands. These acts were utterly incompatible with the enjoyment of the way as it had formerly been used; and the immediate occupancy and total obstruction on the principal side, its larger half west, with Craig's exclusive occupancy on the east, are strongly corroborative of what he, in truth, did intend. The party himself entitled to claim the servitude, or rather as the common law calls it, the easement, is not alone; but the person who, it is claimed, owes it, at once closes in with that intent. Here is clearly a joint intent and a decided effort by all parties interested to get rid of this easement; and if it be not avoided, it must be owing to the legal impotency of what they have done. Can this be so? Even a rent raised by deed may be extinguished in this way by mutual consent. The lessor enters and expels the tenant; if the latter does not choose to return, the rent is gone; though if he return, it is only suspended during the expulsion. *Lewis* v. *Payn,* 4 Wendell, 423, 427. *Cibel & Hill's case,* 1 Leon. 110. And a lease by deed for sixty-seven years, was held to be forfeited at the election of the lessor, by a parol disclaimer of the lessee. *Jackson ex dem. Van Schaick* v. *Vincent,* 4 Wendell, 633. I have used the word "servitude" in speaking of this way. It is the civil law term for rights of the nature of this; and those rights were extensively exercised and well defined by that law. The term is equally significant, with easement, or incorporeal

hereditament; it has of late been in some measure naturalized in this country; and I prefer, therefore, returning to its use, and continuing it through the remainder of the examination of the chief question.

It is a well known rule in the Roman law, that the party himself to whom the servitude is due, may, short of the period of prescription, (limitation with us, we have seen, 20 years,) effect its extinguishment by merely suffering the erection of obstructions of a permanent and solid kind, such as edifices and walls. (3 Kent's Comm. 448, 3d ed.) A fortiori if the act be done by the party to whom the servitude is due. On this head. the following is given to us as the rule of the common law, by Chancellor Kent in his 3d Com. 3d ed. 449: " If the act which prevents the servitude, be incompatible with the nature or exercise of it, and be by the party to whom the servitude is due, it is sufficient to extinguish it; and if it be extinguished for a moment, it is gone forever."

This rule had long existed in respect to certain kinds of rents, commons, and some other servitudes, but seems to have been more distinctly applied to prescriptive claims, by the late case of Moor v. Rawson, 3 Barn. & Cress. 332, 5 Dowl. & Ryl. 234, S. C. than any other English case I have seen. The plaintiff claimed damages for obstructing his ancient lights. The preceding owner formerly had ancient lights at the spot in question; but some 17 years before, had taken down the lighted building and erected a blank wall. Then the defendant built close to him; when the plaintiff opened a window at the place of the former ancient window and brought his action for the obstruction; and the court held that he could not recover, though the non user was for a less term than 20 years. The court agreed that after doing an act of that kind, it lay with the plaintiff to show an intention to resume the use of the windows within a reasonable time; that by building a blank wall, others might have been induced to purchase for building purposes. The words of Bayley, J. are strong and pertinent: "In this case the former owner of the plaintiff's

premises had acquired a right to the enjoyment of the light, but he chose to relinquish that enjoyment, and to erect a blank wall instead of one in which there were formerly windows. At that time he ceased to enjoy the light in the mode in which he had used to do, and his right ceased with it." Holroyd, J. concurred in this view of the case; and so did Littledale, J. He says, perhaps 20 years, as insisted at the bar, might be necessary to extinguish the right to a common or way; but he evidently did not advert to the distinction between a mere non user and a positive obstruction. All the judges lay great stress on the possible injury to purchasers of the adjoining premises, who might come in on the faith of such appearances. But the great and leading case on this head, and the one on which Chancellor Kent mainly founds his rule, is that of *Taylor* v. *Hampton,* 4 M'Cord, 96. In that case, General Wade Hampton, the defendant, had purchased of Mr. Charles Pinckney, in 1807, 115 acres of land, with a mill pond, dam and mill in full operation, which continued till 1814. The pond flowed the land of the plaintiff; and there was no dispute that the defendant had a right to this flow as a servitude by prescription. In 1814, a new mill was erected by the defendant, above the place where the old mill stood, upon which the water of the old mill flowed; wherefore the lower dam was cut, the water let off, and its use as a mill abandoned. This dam was, however, immediately repaired, and the water raised, occasionally, for the purpose of flowing rice; but in the main, the plaintiff's land was eased of the former flow, from 1814 to 1823, when the upper mill was burned down, and the old mill was rebuilt in the former place; the water being again permanently raised, and the flow resumed over the plaintiff's land. The verdict being for the plaintiff, in a suit for that injury, on a motion for a new trial, Nott, J. delivered the opinion of the court. He stated the main question to be, whether the erection of the upper mill, the existence and enjoyment of that being incompatible with the use of the other by means of this pond, did not extinguish the right of flow, formerly held by the defendant.

After looking extensively into the learning of the civil and the common law in respect to the extinguishment of servitudes, he comes to the conclusion that it did. He shows that the act of the party entitled to the servitude is to be taken strongly against him; and not only by the civil law, but by the common law, and analogous doctrines of our courts of equity, it shall be held to work an extinguishment, where the same circumstances, were they the result of the law or of inevitable accident, would be a mere suspension. " Where," says the learned judge, " a right is suspended by the act of God, as by the drying up of the spring, it will revive again if the spring chance to flow; but if it be suspended by the act of the party, as by building a house or wall, it would not be restored even though the obstacle should be removed by a stroke from heaven." It appears in the course of the opinion, that the plaintiff had purchased the land flowed, intermediate to the erection of the upper mill and the restoration of the lower pond, perhaps in 1817, though by the statement of the case, (probably a misprint,) it seems to have been 1807. On this the judge proceeds, "I think it not unimportant that the present plaintiff was a purchaser for a *bona fide* consideration at the time when the defendant had thus proclaimed to the world, that the privilege which he now claims was useless and even incapable of being enjoyed by him." Arguing from the common law, it is remarkable that he intuitively adopts *as one illustration*, the very point I have mentioned, as decided in *Moore v. Rawson.* This was a case of 1824, only 3 years prior to *Taylor* v. *Hampton.* " Suppose," continues the judge, " a person to be the owner of a house with ancient lights, which no person has a right to obstruct. If he erect a house, or put up a wall directly covering his windows, has he not extinguished his light himself as effectually as if he had blown out his candle? It does not require a reference to Coke, Justinian or Domat, to establish that. Surely, then, it would amount to a license to his neighbor to put a similar building on his adjoining lot. Suppose A. to have a right of way over the land of B. If he erect a house on his own

land in such a manner as to obstruct the passage into the lands of B. does he not effectually destroy his right of way? Can he claim a right, the enjoyment of which, he has rendered impossible by his own act? These cases are so plain that they must be comprehended by every one." Speaking of the decision in respect to lights, in *Moore* v. *Rawson*, Chancellor Kent says, " It is the modern doctrine, that the ceasing to enjoy such an easement will destroy the right, provided the discontinuance be absolute and decisive, and unaccompanied with any intention to resume it within a reasonable time ; and it is a wholesome and wise qualification of the rule, considering the extensive and rapid improvements that are every where making upon real property." 3 Kent's Comm. 3d ed. 450. And I must be permitted to observe again, that I cannot see why Mr. Justice Littledale, in *Moore* v. *Rawson*, should have hinted that 20 years *obstruction*, might be necessary to extinguish or bar a way or common, more than the servitude of light to an ancient window. Both are acquired by the same prescriptive term ; and both are, when acquired, equally in the class of incorporeal hereditaments, and are now, in England, protected by an act of parliament, making the title absolute after a given number of years. 1 Chit. Gen. Pr. 206, 214.

The general rule being established that such rights may be extinguished by the act of the party beneficially interested, done upon the land where the servitude is exercisable—no writing being necessary, but the case being clear of the statute of frauds—we are then at liberty, and it is quite material to consider whether the party purchasing the land apparently discharged of the servitude, has not a right, the matter not being explained to him at the time, to insist on holding the one to whom the servitude is due to such apparent discharge, even though he might have intended a mere *suspension*. We have seen that great stress was laid upon the possible deception of *bona fide* purchasers in *Moore* v. *Rawson*. And in *Taylor* v. *Hampton*, the actual deception upon the purchaser was made a conspicuous ground of the decision. The rule in equity was very pro-

perly adverted to in the course of the argument by Mr. Justice Nott. A man stands by and silently sees another build on his own premises ; his right is gone. And another doctrine comes in, viz. that of estoppel *in pais*. This is well laid down by the present chief justice in the *Welland Canal Co.* v. *Hathaway*, 8 Wendell, 483. It is there said to apply where the act is designed to influence the conduct of another, and does have that effect, and when a denial will injure another. It is scarcely necessary to observe that a man shall be held to design or intend the natural consequence of his own act. The plaintiff, the owner of a slave, stood by and saw the defendant use him as his own, under a supposed claim of right, which he had reason to believe was genuine, but which the plaintiff secretly knew was not so. In an action for the services of the slave, the plaintiff was held to have forfeited his claim to them. 6 Wendell, 436. I shall cite no more cases, though the modern books are studded with them ; and there is no rule which has been applied with greater effect in the expurgation of fraud. Was the matter explained to the defendant when he bought at the master's sale ? Was he then told that though Mr. Craig had erected the fence, yet he meant it as a temporary thing ? I see nothing of this in the case. What was to be inferred from seeing the fence running along the centre of the alley and the whole western side of the passage choked with rubbish ? Did this state of things show an open common way between the houses ? and if the direct contrary, who is responsible for the representation ? The answer is, the man who made it, the man who built the fence, and tolerated and invited the total obstruction. For aught we know, the defendant may have purchased and paid his money on the faith of that very fence, being under the belief that he would have a perfect right to build to the line. Indeed, such is a most natural inference. Without that in all probability, his money would never have been paid for the lot, or at any rate not the full price which he gave. If not chained by the statute of frauds or some technical rule, the law would suffer disgrace by allowing such a delusion to be practised upon a *bona fide* purchaser.

I have little indeed to add to the high authorities cited, with their striking and apposite illustrations. The doctrine insisted upon at large in the argument as to the binding effect of a practical location, by a consentaneous partition fence, even in the face of the plain lines of a deed or patent, is familiar to the legal profession in this state. That too is well settled and strikingly analogous. It was also pertinently said at the bar, that a partial obstruction or inclosure by one, where the right is mutual, will extinguish the servitude at the common law. The instance presented was the familiar one of common by cause of vicinage, which arises where the cattle, for want of fences, have intercommoned in the neighborhood time out of mind. In *Bacon* v. *Palmer,* 1 Brownl. 174, a commoner in replevin prescribing upon this right in one field, the plaintiff pleaded that the lord had enclosed another and a remote field lying in the same common tract ; and the reporter notes that such an act extinguished all the common. In the case at bar the parties, or rather those under whom they claim, had a common right to this way. There is no question that the way has been partially obstructed by permanent erections on the side of the plaintiff. Its use has been seriously narrowed, not to say destroyed. The way at least, as between the parties, was an entire thing; and it seems to be a general principle, that in case of a common person, if an entire thing be divided or extinguished in part, by the act of the party, it is an extinguishment of the whole. This is said in Anderson, 175, pl. 211, and is illustrated from the year book of Assizes by the tenant of a rent charge on several acres purchasing one acre. By that the whole rent is extinct. So if he released his right in one acre. Vin. Abr. Extinguishment, pl. 2. So of a common in one acre. Id. pl. 13.

If I am right in saying that the way is partially covered by the wall of the plaintiff's new brick building, (and looking at the sworn diagram of Mr. Hooker, the city surveyor, and comparing it with the other testimony, I cannot entertain a doubt of it,) the action bears one most singular feature. It presents this defence as the most important benefit which could be performed to the plaintiff's premises ; for

clearly, if opened at all, the whole way must be restored to its ancient width. If that be literally done, I do not see but the west wall of the plaintiff's building must be the most of it pulled down. It must be pared off at the west, not to say otherwise contracted, in order to give to the defendant the entire benefit of the old distance, perhaps the full road for sledding in wood. The plaintiff, it is true, came in as a stranger, under a deed which speaks of the common alley; but he is bound to abide either the exact old condition of things or conform to the new; and so of the defendant. Their rights either way are common.

I am inclined to think that the encroachment by the building alone would have worked a complete extinguishment; but the fence in the centre was a most unequivocal act within all the authorities. It was the only effectual way, short of permanent cross fences at each end between the buildings, thus enclosing the whole intermediate ground of both parties, by which the defendant could be completely shut from the enjoyment of the eastern half of the way. He was driven on to his own ground. His rights of way as such were cut off. He is left with a narrow strip of his own land, which the plaintiff is unwilling that he should enclose in his own fashion. I feel clear, however, that he has a right to do that, because the old servitude is gone.

There is a stipulation to turn the case into a special verdict; but there are some difficulties in the way, as was mentioned upon the argument. One was, that the facts are not so definitely stated in the case, but that in framing the verdict, which must be made up of positive conclusions from the facts, injustice might be done to one or the other of the parties, by making the verdict find on some material question wrongly. Some embarrassment was mentioned as having arisen before the circuit judge under the stipulation. Be that as it may, if the case is to come to a special verdict or a bill of exceptions, I think it had better go down to a new trial, under the views we have taken of the law applicable to the facts as we now understand them. The parties will then know more nearly where the dispute lies which is

ALBANY,
Jan. 1837.

Corning
v.
Gould.

proper to be settled by a jury, and thus the former difficulties will be in some measure removed. Among other questions, that of the encroachment of the wall can be found distinctly one way or the other by the jury, and its extent, if any. So the circumstances under which the fence was erected, the intent with which that was done, provided any explanation that it was for a mere temporary purpose was given; the condition of the premises, more particularly at the time of the defendant's purchase; and whether he was apprised that the way would be insisted on notwithstanding appearances, &c. These and the like conclusions being left open on a special verdict, a court of error could not well reach them so as to settle the law of the case. I do not say that we could not, under the stipulation, draw the conclusions ourselves, and direct them to be entered on the record; but we prefer the other course.

Let a new trial be had, the costs to abide the event.