HOLMES et al. v. CLEVELAND, C. & C. R. CO. et al.[1]

(District Court, N. D. Ohio. July 17, 1861.)

1. CORPORATIONS—ACTS AMOUNTING TO DISSOLUTION.
The Connecticut Land Company was organized in 1795 for temporary purposes, the object being to obtain and perfect the title to the lands known as the "Western Reserve," and to survey and partition the same in severalty between the stockholders. In 1809 the objects of the company had been accomplished, and on final partition and division of the property a resolution was adopted at the stockholders' meeting that such partition should be conclusive, and "no after-allowances claimed on account of any error in cost, measure, or otherwise," and should be final, "unless further property belonging to the company be discovered." The meeting then adjourned without day, and no further meeting was ever held, either of stockholders or directors. *Held,* that such action must be regarded as practically a dissolution of the company and a final settlement of its affairs, and that a suit could not be maintained in its behalf or in behalf of its stockholders, 50 years later, to recover a small parcel of land on the lake shore in Cleveland, the town having been laid out by the company, which parcel was of little or no value at the time and for many years thereafter, until the making of improvements by the defendants and the public authorities rendered it valuable; that the company must be presumed to have known of the land, and to have intended to abandon it to the use of the public, or as worth too little to be taken into account.

2. DEDICATION OF STREET—REVERSION—ABANDONMENT BY PUBLIC.
There is no abandonment of the rights of the public in a street which has been dedicated to public use by reason of a temporary interruption of its use by an outside cause, such as the washing away of a portion of it.

3. SAME—NATURE OF USE.
Where a use made by a city of a street is by express legislative authority, it is presumed to be for the benefit of the public.

4. EVIDENCE—PRESUMPTIONS FROM LAPSE OF TIME—RECORDING OF CITY PLAT.
Where it is shown beyond question that a plat of a town or city was made and left for record in the proper office, and was always recognized and used, whenever required, as the official map of the survey, its proper recording will be presumed after the lapse of 50 years.

5. DEDICATION—STREET BORDERING ON SHORE LINE OF NAVIGABLE WATER—ACCRETIONS.
When the town of Cleveland was laid out by the proprietors of the land, the Connecticut Land Company, in 1796, Bath street was laid out as bounded on the north by the lake, and was so shown on the plat, which was always recognized by the company. The street was used by the public to a greater or less extent; and after a number of years, owing mainly to improvements made in the harbor, the shore line was extended

---

1 Erroneously reported in 8 Am. Law Reg. (O. S.) 716, as a decision of the "supreme court of Ohio."

northward by accretions until nearly 20 acres of land was added. In 1844, the city, under authority of an act of the legislature, subdivided and platted the ground, and leased portions not needed for travel, for dock purposes. Afterwards certain parts were acquired from the city by the five defendant railroad companies for terminal purposes, and they expended large sums in improvements thereon. *Held,* that by the action of the land company it dedicated as a street the land to the shore of the lake, which included the easement as a landing as well as for travel; and that, after the property had been used by the city and its grantees for more than 50 years, a suit in equity to recover either the original land or the accretions could not lie by those claiming to be the successors in title to the land company.

6. EQUITY—LACHES.
   In such case equity will refuse relief, if for no other reason, because of the laches of those claiming adversely to the city in not sooner asserting their claims.

7. SAME—LACHES—RULE GOVERNING COURTS.
   While a court of equity will, under ordinary circumstances, follow the statute of limitations as to questions of laches, it is not bound to do so, and will be governed by the peculiar circumstances of each case.

This was a suit in equity by Henry Holmes, Julius C. Sheldon, and others, brought on behalf of themselves and the other heirs of the stockholders of the Connecticut Land Company, to recover a parcel of land in the city of Cleveland. The defendants were the Cleveland, Columbus & Cincinnati Railroad Company, the Cleveland & Pittsburgh Railroad Company, the Cleveland & Mahoning Railroad Company, the Junction Railroad Company (the Cleveland & Toledo Railroad Company), the Cleveland, Painesville & Ashtabula Railroad Company, and a large number of others, including the state of Connecticut. The bill was filed October 6, 1853, in the circuit court of the United States for the district of Ohio, and was transferred to the Northern district of Ohio January 8, 1857, where it was tried. Only the railroad companies defendant answered.

Matthew Birchard and Mason & Estep, for plaintiffs.

S. I. Andrews & Bishop and Backus & Noble, for defendant Cleveland, C. & C. R. Co.

Moses Kelly and Bolton & Griswold, for defendant Cleveland & P. R. Co.

Bishop, Backus & Noble, S. F. Vinton, and Moses Kelly, for defendants Cleveland & M. R. Co. and Cleveland & T. R. Co.

S. I. Andrews & Bishop and Backus & Noble, for defendant Cleveland, P. & A. R. Co.

McLEAN, Circuit Justice. The complainants claim in this case to be the owners in equity, in common with others, unknown, and too numerous to be made parties if known, of a parcel of land in the city of Cleveland, bounded north by the dividing line between Lake Erie and Canada and the United States, east by Water street in said city, south by the north line of lot 191, and west by the Cuyahoga river as it ran in the year 1796, and by a line from its mouth parallel with the east line. They also allege that said land originally belonged to the stockholders of the Connecticut Land Company, which owned the entire Western Reserve, and that they and their heirs are the representatives of such stockholders, and that the lands of the reserve were

conveyed to mere naked trustees for the benefit of such stockholders; that on March 23, 1836, one Thomas Lloyd fraudulently procured a deed from said trustees, conveying the land claimed in this suit, and that defendants are in possession of said lands under a title made from said Lloyd, with notice of the trust and fraud. The prayer of the bill is to set aside said fraudulent deed, dissolve said trust, and have a partition of said land, and an account of the rents and profits thereof received by the defendants.

The defendants insist that the title to all of said land covered by the water of Lake Erie is in the public, and not in any trustee for them; and as to the residue of said land rely for a defense upon the equitable bar furnished by lapse of time, want of title in equity in the complainants, and upon a dedication of said land to the public by the Connecticut Land Company as early as 1796, accepted immediately thereafter, and ever since used in accordance with the purposes of the dedication. They deny that they are in possession under the title derived from said Lloyd, and aver that they are in possession, under the authority of a statute of the state of Ohio, in pursuance of a license granted by the city of Cleveland, and using the same in a manner consistent with the original dedication.

The leading historical facts of this case are believed to be accurately and succinctly stated in the defendants' brief. The Connecticut Land Company was organized in Connecticut in 1795, and became the owner of the Connecticut Western Reserve, and issued to its stockholders certificates of stock for their respective interests therein. This title was made to the state of Connecticut by the United States under the act of April 28, 1800, and was vested in trustees for the purpose of partition and conveyance to purchasers. The company caused all its lands east of the Cuyahoga and the Portage Path to be surveyed into townships in the year 1796, and also selected for sale six townships, including the city plot, which were immediately (except the city plot) surveyed into 100-acre lots, and the whole put in market. In the year 1798, by mutual arrangement between the proprietors of said land company, in pursuance of the original association, partition was made of all the company's lands surveyed as aforesaid except the six townships and the city of Cleveland, and the legal title was secured to the stockholders in severalty. The company, by its agent, continued to control the land in said six townships and the city plot until December, 1802, when, having caused the unsold land thereon to be resurveyed, they in like manner distributed the same among their stockholders, and reserved the legal title to each, and in said partition avowedly included all that remained unsold in said townships and city. In April, 1807, they in like manner divided all their land west of the Cuyahoga and the Portage Path. Soon after this, it was discovered that, by reason of omission in the surveys, a small piece of land, not connected with the city or the six townships, had been omitted, and this, called "surplus land," was surveyed into lots in the city and in the six townships which had been under contract, and become forfeited; whereupon, at a meeting of the stockholders of said company, held according to its constitution, at which they were fully represented, on the 4th January, 1809, it was

resolved "that the company divide in severalty among the stockholders all their property, consisting of notes, contracts, bonds, and land, according to their plan of partition previously adopted," and that the partition made should be conclusive upon the proprietors, and "no after-allowances claimed on account of any error that may have happened in cost, measure, or otherwise. But said division shall be final, unless further property belonging to the company be discovered." The company thereupon proceeded to make the partition, and reserve the title to the stockholders in severalty, as proposed; and thereupon, on the 4th January, 1809, it was voted "that this meeting be adjourned without day." Up to that time the company kept full records of its proceedings, but since which time there never has been a meeting, either of its directors or stockholders, up to the commencement of this suit.

The first plot and survey of the city of Cleveland was made in 1796 by Augustus Porter and Seth Peare, who were the authorized surveyors of the Connecticut Land Company, and who superintended the surveys of the entire reserve east of said Portage Path. This survey is called "Peare's Survey," and the original field notes and maps are in evidence. On this map was marked "Bath Street," connecting Water street with the river, and bounded north by the lake, and south by lot 191, and varies in width from 80 to 200 feet. In describing the lots east of Water street, the length of the lines above the bank only are given; but on the map they extend to the lake. In March, 1802, the trustees of said land company conveyed three of said lots—Nos. 1, 2, and 3—lying next east of Water street to Samuel Huntington, bounding them on the north by the lake. This deed also recognized the lake as the north boundary, and it was also the northern boundary of other lands and lot 191. On December 6, 1800, the territorial legislature of Ohio passed an act entitled "An act to provide for the recording of town plots," and in 1801, Turpland Kirtland, being then the agent of the company, undertook to make a plot of said city, to be made, proved, and recorded as required by that act, the effect of which would be to vest the streets and other public grounds in trust for the purposes therein expressed. Amis Spafford, a surveyor, made a survey of the city, which he called field notes and minutes of the survey of the outlines, lands, and squares of the city, for the land company, in 1796. Both Peare's and Spafford's plots and surveys— Peare being the first one—have been recognized from their origin to the present by the members of said land company, and the map of Peare was regularly recorded on the proper record for Trumbull county by the agent of the company. In the year 1833, River street, being nearly parallel with the river, was opened, and terminated at Bath street, about 140 feet distant from the river; and thereafter the latter was used as a thoroughfare from Water street to the river and the lake.

In 1827, the United States, in improving the harbor, cut a new channel for the mouth of the river, running directly north from a point near the northwest corner of lot 191, and thereby left on the west side of the river a small portion of Bath street,—perhaps one-eighth of an acre. Immediately after the construction of the har-

bor, the accretion commenced on both sides of the river, and has continued to increase, particularly on the west side, until one-eighth of an acre has increased to seven or eight acres. After a few years the accretion so increased as to prevent the washing of the bank, and it ceased to cave at the intersection of Water and Bath streets, and thereupon, about the year 1830, the corporate authorities repaired said streets, and again opened the connection between them, since which time Bath street has been one of the principal thoroughfares of the city. In 1840, in pursuance of authority given by its charter, the city council caused the exact boundaries and fronts of all the lanes and streets of the Cuyahoga river below Vineyard's Lane to be surveyed and ascertained, of which survey a report was made August 4, 1841, which was accepted, and thereby the city council established the boundaries and fronts of said streets and lanes according to said survey, which designated the entire territory between lot 191 and the lake at Bath street, and fixed its boundaries accordingly. On December 21, 1844, the legislature of Ohio, by statute, authorized the city council to lease any portion of the streets adjacent to the lake and river, needed for public use as docks and wharves, for a term not exceeding 10 years; the rents arising therefrom to be appropriated to the repairs of the streets and of the public wharves. February 4, 1845, a subdivision and plot of the territory called "Bath Street" east of the river was made, designating for public use certain streets thereon, and also certain lots by number, several of which lots were soon after leased by authority of the city council, under the limitations stated in said statute, and possession was taken by the tenants. They were used almost exclusively for the storage, sale, and shipment of coal. Against these tenants suits in ejectment were commenced in favor of Lloyd's lessee, which were defended by the city. Pending these suits, in 1849 or 1850, the railroad companies, or some of those now occupying the land east of the river in pursuance of the authority conferred by the statute under which they were incorporated, finding it necessary, in the location of their roads, to occupy said grounds, instituted the requisite proceedings for appropriating the same. After the instrument of appropriation was filed, under the authority of the same statute, they agreed with the city upon the terms and manner of occupying the same for railroad purposes, and also, to avoid annoyance from Lloyd and his assigns in the use of such portions of Bath street as they now require for their roads, purchased out of the asserted claims of said Lloyd or his assigns, and since have expended over $450,000 in improvements upon said land, and in reclaiming the same from the lake by means of piling and filling, and thus the accretion has been greatly extended.

The articles of association did not contemplate a permanent organization of the Connecticut Land Company, but were entered into for the better and more convenient accomplishment of certain necessary and temporary objects, which could not be effected except by a joint action of all the proprietors in some form. These necessary objects, but temporary in their performance, were the extinguishment of the Indian title, the survey of their lands, and the par-

tition of them in severalty among the proprietors. It was the policy and intent of these articles that this trust should continue until the partition could be had, and no longer; and they directed a survey of the whole territory within the term of two years, and that the trustees should convey the whole in severalty to the purchasers and shareholders. The parties to the articles of association, viz. the proprietors, the board of directors, and the trustees, proceeded to carry them into execution. The Indian title was extinguished, the country was surveyed, the directors sold so much of the land as they were required to sell; and in January, 1809, all things being now ready, the proprietors, at a regular meeting, made a final division in severalty of all their lands, and all outstanding claims for lands sold by the directors, and, in a word, all of their common property of which they had any knowledge. The resolution directing the partition declares that the division then made shall be conclusive upon each proprietor, and that it should be final, unless further property belonging to the company should be discovered. There is no averment in the bill, nor any attempt to prove, that the existence of the land now in dispute was then unknown to the proprietors. This resolution shows, in a very pointed manner, that it was the understanding and intention of the proprietors that the division then made should stand as a full, complete, and final execution and accomplishment of the articles of association, and of every and all of its objects, saving only the contingency of the after-discovery of property then unknown to them; and that such property, if any, as was unknown, and which, because it was regarded by them as worthless, or for any other cause they did not think it worth dividing, they abandoned, or left it to whoever was or might become the occupier or possessor of it. That the proprietors understood this should be a final dissolution of the company, subject alone to that one contingency, is evidenced from the fact that the proof shows that prior to this time they held regular meetings, and that no meeting of the company was ever held afterwards.

Nearly 50 years have transpired since this association was dissolved. The proof shows that a quarter of a century afterwards the land referred to was of little or no value. None has been imparted to it by the associates or their descendants. But a very great and permanent value has been given it by the terminus of the canal from the Ohio river to Lake Erie, and by a large amount of money expended by the United States and by railroad companies on this land, in improving the harbor of Cleveland, which last has caused it to be made the common termini of five important railroads, which have expended upon it more than half a million of dollars in erecting depots, freight and passenger houses, wharves, etc., for the benefit and convenience of trade and travel. This final action on the affairs of the Connecticut Company must be considered as conclusive. In 1809 the town was limited, and its business prospects were small. It was deemed a proper time to close the concerns of the Connecticut Company before its affairs became complicated, and its rights were misunderstood or misrepresented. It is not alleged that any part of the matters were overlooked or forgotten.

Some things may have been deemed too unimportant to attract attention; some lands, perhaps, that at that time would not pay the expense of their reclamation. These were all matters of examination and reflection, and must have been duly considered. Those only that were unknown to the party could come before them for review, unless on a charge of mistake or fraud. Everything else was settled,—finally settled. This was understood, and solemnly assented to. Under no other circumstances could a final adjustment be made. This was the object of the association. In no other mode could the desired object be ascertained.

There was a peculiar fitness and propriety in this company adjusting, as it did, all matters of account. Their shares were numerous, and consisted in minute pieces of property, in some instances scarcely susceptible of division. Speculation had not then got to work, and a division was not found sufficient. A general interest was felt for a rising village, and each individual was willing to contribute what he could, in reason, to its prosperity. It may be fairly presumed that there was a disposition to give up the shreds and patches to the public for the advancement of the general interest. This was seen in the action of the city council, and, at a future period, that of the government of the United States, in the streets and harbor, to adapt them to a rising commerce. But the most persuasive action was that of declaring that they abandoned everything known to the association at the time, and there is reason to believe that this was done with the view of imparting to the public such commercial and other advantages as might be useful. The entrance of the canal into the lake at Cleveland, and the public works on the wharves and the water line of the lake, were at first gradually extended, and afterwards rapidly, to meet the growing necessities of commerce.

It is not essential that ground intended for public use should be formally so dedicated. It is enough if the public shall take possession of the ground, using it for public purposes; and, if it shall continue to do so for a long term of years, the public right will be presumed. This would depend upon a longer or shorter time, according to the circumstances of the case. It is a well-known principle of law that every owner of property, whether personal or real, may abandon it. Cholmondeley v. Clinton, 2 Jac. & W. 59; Kinsman v. Loomis, 11 Ohio, 479. In Corning v. Gould, 16 Wend. 543, it is observed that "a man shall be held to intend what necessarily results from his own acts." Consequently, when property is abandoned under such circumstances as to leave no doubt of the fact, no one who has taken possession of it can be required to relinquish it. In Kirk v. King, 3 Pa. St. 436, an abandonment and nonclaim for seven years was held sufficient. Whether there be an abandonment is a question of fact, to be determined by the circumstances of the case (Ward v. Ward, 14 Eng. Law & Eq. 414); and, when this is done, the right is extinguished (1 Browne, Civ. & Adm. Law, 33, 166, 237, 239–241; Hillary v. Waller, 12 Ves. 264). Where a person considers an article worthless, and casts it away, he thereby devests himself of his title, and cannot complain if any other person takes possession of it. The fact

of abandonment is sufficient. McGoon v. Ankeny, 11 Ill. 588. Taylor v. Hampton, 4 McCord, 96, 102, is a strong case of abandonment. Hartford Bridge Co. v. East Hartford, 16 Conn. 149; Wright v. Freeman, 5 Har. & J. 467; Picket v. Dowdall, 2 Wash. (Va.) 115. Some of the leading decisions on this question are Beckford v. Wade, 17 Ves. 98, 99; Bonney v. Ridgard, 1 Cox, Ch. 145; Bergen v. Bennett, 1 Caines, Cas. 19; Prevost v. Gratz, 6 Wheat. 481. But it is unnecessary to multiply authorities on this point. It is a doctrine too well established to be controverted.

When the town of Cleveland was laid out and surveyed, the property in dispute was dedicated by the Connecticut Land Company. The evidence is conclusive. It is proved by both Peare's and Spafford's maps, and by the minutes of the survey of the town plot. And that it was used from the earliest settlement of the town, both for a street and a landing, was established by all the witnesses acquainted with the town at that early period. This fact of dedication is too plain for contradiction. The use of Bath street by the public is proved beyond doubt from 1800 or 1801 down to the time when the travel along some part of it was interrupted by being entirely cut away by the action of the lake. Where there is an interruption to the enjoyment of a part of the street, and as soon as the interruption is removed, and the public right is resumed, the cause is sufficiently explained. There is no abandonment of the right. The law works no loss to the public under such circumstances. The act complained of was an abuse which the law corrects. But it is said that this right to Bath street was abandoned by the city of Cleveland in laying out a street 100 feet wide, and selling or leasing the land adjoining the street. This was done under express legislative authority. This, it is supposed, the legislature had the power to do. The idea is a just one that an act done by authority of law must be presumed to have been done for the benefit of the public. The act of May 1, 1800, required town plots to be recorded, under a penalty of $1,000. This was done to avoid litigation. Spafford, one of the surveyors of the company, in 1801 resurveyed the streets, alleys, and public grounds of the town or city. He vacated one or two alleys made by Peare, and added the land to the adjoining lots, and also opened one new alley. Beyond this he made no change in the streets, alleys, and public grounds; consequently made no change in Bath street. Spafford's survey was deposited by the company's agent with the recorder of the county for record, and was in part recorded by him. The deposition of Mr. Cafe proves that this was done, to comply with the recording act of 1800. The minutes and field notes of the survey are found on record, but the map, it is alleged, made by Spafford, is not found in the records. But this is a mistake. The testimony abundantly proves that the authority of Spafford's survey and map has been invariably recognized. Under the circumstances the court will presume this map to have been recorded, if the fact were not shown. The evidence that the map was made and left for record, and was used in all cases where necessary and proper, and this after the lapse of more than half a century, by which the surveys of the town have been regulated for the above period, and on which so many important in-

terests depend, and known, too, so intimately by every one, is too palpable to be doubted by any one. No court can stultify itself so as to question the fact. A mere failure of a ministerial officer to record a map is a matter which will be presumed under far less stringent circumstances than those above referred to. Ingersoll v. Herider, 12 Ohio, 527; King v. Kinney, 4 Ohio, 79; Marbury v. Madison, 1 Cranch, 161.

The grant to Lloyd does not assert that the grantors had any title to the land conveyed. It is a naked quitclaim to what is declared in the deed to have been an unknown and doubtful right. The grantees from Lloyd entered into possession of the premises in their own right and behalf, and not for or in behalf of the trustees of the land company, or of their cestuis que trustent. The defendants are not estopped from showing and claiming that the legal title to Bath street had passed from the trustees to the county or corporation of Cleveland in trust to the public before the date of their deed to Lloyd, and, consequently, Lloyd took no title by that conveyance. And if this be so, where is the trust relation between Lloyd and the proprietors of the reserve? Suppose the trustees of this land, instead of selling to Lloyd, had themselves taken exclusive possession of Bath street under claim of title, what could they do? They, as the dedicators of this street, could file their bill in behalf of the public to correct this abuse; but they could maintain no suit to appropriate the property to themselves on the plea that it reverted to them. In the appropriate language of one of the counsel for the complainants, I would say:

"Lloyd is not in as a purchaser from the original proprietors, those who held the beneficial interest in the land before the dedication, or those who would be entitled to it if the dedication should be avoided. He went to trustees who had a mere naked trust in behalf of the original proprietors, and took from them a release of their trust estate. The deed which they gave would, indeed, pass the trust estate. It could do nothing more. Not a scintilla of beneficial interest was passed by it; and, if there should be recovery in ejectment, the plaintiff would merely stand as the trustee for the original land company, to hold it as their trustee for their benefit. He has nothing but a trust. The deed itself tells the whole story of its inception and consummation."

It is said that an easement, only, passed by the dedication of 1796. An easement under the authority of law remains until the law shall be changed.

It is said that a dedication, if in written terms, cannot be enlarged or altered by parol. A dedication may be made by parol. The books are full of such cases. The Pittsburgh Case is an evidence of the fact, and the Cincinnati Common. But where a dedication is made more than a half a century, evidenced by a map and other terms of description, which have served as guides fixing the plan of the town, designating its streets, its alleys, and its lots, and which maps and written papers have, by universal consent, been referred to as establishing for more than half a century the demarkations of the property of the town, including the streets owned by the public, the private rights of individuals can never be doubted by any court which regards the rights of property as permanently settled.

The counsel, in the defense, argues that the property in contro-versy was dedicated to the public, or abandoned; and this, it is in-sisted, is neither good logic nor good law. The argument, as under-stood, was in the alternative, and was certainly good to show that, if the property had been dedicated or abandoned, the right was not in the complainants.

The land sought to be recovered is now very valuable, and, including the alluvial formation which has been added, embraces 20 acres of soil above high water, exclusive of streets and the lake shore. It is claimed as having been dedicated as Bath street of Cleveland. The original survey of this property was a street by Seth Peare, Septem-ber 16, 1795. By this survey and map, and the sales made by the proprietors between 1796 and 1800, it was claimed to have been dedi-cated as a street. This is shown by Peare's map and minutes and the record of the Connecticut Land Company. Happily, the original of the minutes and the map have been preserved in the form they were when the Cleveland Land Company began to act upon them in selling lands in 1797. And to this day there has never been any other survey or field notes made by any one. Spafford's map made new traces of old lines, and placed more permanent monuments on the ground. In Peare's map a space of lot 191, and west of Water street, and south of the water's edge of the lake shore, is left unsur-veyed into lots, and is marked on the map, "Bath Street." A great number of statutes, from time to time, were passed to establish and regulate the streets of Cleveland, and certain lots were authorized to be leased for various purposes for the public service, and this policy seemed to have been continued for a great number of years where such lots were not required for other purposes. In 1841 the council of Cleveland made an interesting report in regard to certain streets, in which they say of Bath street that all land westerly of Water street, east of Cuyahoga, and northerly of lot 191, bounded southerly by a line south, 64 deg. west, was included in Bath street. And they say: "The committee are of opinion (Anson Haysen dis-senting) that all the land lying northerly of lot 191, as subdivided, and the northerly part thereof located and extended northerly to Lake Erie, is included in Bath street, and is a legal highway."

In Barclay v. Howell, 6 Pet. 512, the court say:

"Where a part of a strip of land adjoining a river had been used as a way, and the residue was not in a condition to be so used without grading, etc., and the public authorities from time to time improved more and more of it, and the proprietors had made no claim for thirty years, and their agent de-clared when the town was laid out that it was reserved for a street, held, that the jury would be warranted in finding a dedication of the whole strip, and, if so dedicated, the proprietor could not recover."

And that an agent in laying out a town returns a plan, afterwards acted on by the principal, and, while engaged in the work, declares to the effect that a certain slip of ground was reserved for a street, is admissible to prove a dedication of the land to that use.

And in the case of Godfrey v. City of Alton, 12 Ill. 30, the court say:

"When a street is laid out bordering on a navigable water, it will be pre-sumed that it was intended to be dedicated both for a highway and a land-

ing. The navigable water is a highway; and when, in contact with this, the easement of a street or highway is granted, the very location of the latter shows that it was designed for the purpose of loading and unloading freight, and landing passengers from the water. The dedication of the banks of the water unites the two easements, each of which is essential to the full enjoyment of the other."

Every one knows that the accretions on the shores of our lakes, in most cases, rapidly increase, and that they are claimed as generally belonging to the owner of the fee. This has long been the doctrine of our courts, and it applies as well to the civil as the common law. But I am not sure that the doctrine may not have been carried too far, where the accumulations have arisen, in a considerable degree, from the improvement of the ports and landing places. In regard to a general commerce, or a more limited one, where the expenditure is necessarily incurred by the public, it should exercise control for the protection and interest of commerce.

It may be necessary to inquire how far this alluvial formation may be followed when the person bounded by it has been subjected to no expense, and when it may become inconvenient to the public. How shall the limit be fixed? It is indispensable that there should be a regulation which should be just to all parties interested in it, and should protect the symmetry and convenience of the port. It would seem that where the lot of the occupant was bounded by a street which formed the water line of the shore he was limited by the street, and could not claim beyond it. But where the street did not limit the boundary, the owner of the soil is obliged to protect his shore, and for this purpose he may claim the alluvial formation. So, in regard to the common at New Orleans; it was enlarged by deposit, and to preserve the commerce of the city the made land was protected to prevent the city from being cut off from the river.

Independently of the dedication of Bath street, extending to the line of the lake in 1801, and the abandonment in 1809, after the surveys were completed and the Indian title was extinguished, the objection remains that by the progress of time the claim had become stale, and not a proper subject of relief in equity. In the case of Smith v. Clay, 3 Brown, Ch. 642, note, it is said by Lord Camden:

"A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive, and does nothing. Laches and neglect are always discountenanced; and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court."

By analogy to courts of law, chancery will apply the act of limitation. In Hovenden v. Annesley, 2 Schoales & L. 638, 639, the doctrine of the court is "that, in cases where the statute does not afford a direct analogy, the court will proceed according to its discretion, and this discretion will be governed by considerations of public policy, in view of the circumstances of the particular case." In a certain class of cases a court of equity, acting on its own original principles, will refuse its aid under the special circumstances of the case; and

under other circumstances will give relief in less time than required by the statute. The chancellor, under ordinary circumstances, will follow the statute. But he is not bound to do so, but will be influenced by the peculiar circumstances of each case. This doctrine is laid down in almost all the leading authorities, and especially in Beckford v. Wade, 17 Ves. 98, 99; Bonney v. Ridgard, 1 Cox, Ch. 145; Bergen v. Bennett, 1 Caines, Cas. 19; Prevost v. Gratz, 6 Wheat. 481; Hughes v. Edwards, 9 Wheat. 489; Miller v. McIntyre, 6 Pet. 61; Piatt v. Vattier, 9 Pet. 405; Bowman v. Wathen, 1 How. 189.

Vigilance is required in the prosecution of claims, and it has been the policy of all governments to bar claims if not prosecuted within a limited time. More than half a century has transpired since the affairs of the Connecticut Company were said to be finally adjusted. All claims known to the company at that time were settled in regard to debts due and the distribution of property. Great particularity, it is said, was observed in the exactness of this adjustment. The first and second generations of this large Connecticut company have gone to their account. I now speak of the shareholders of the original company. But a small portion of them can now be living. If they had left no other record of their lives and deaths, we should have looked for them among the memorials of the dead. But the papers of this suit contain some of the names of the descendants of the shareholders, if not some of those who belonged to the company originally. It is a well-established principle, that a mere quitclaim deed, without covenants of warranty, does not estop the grantor from showing that no title passed by such deed, and that, consequently, by the principle of reciprocity, it cannot estop the grantee from denying the title of the grantor at the date of the deed. The defendants, then, are not estopped from showing and claiming that the legal title to Bath street had passed to the trustees of the county or corporation of Cleveland, in trust for the public, before the date of their deed to Lloyd, and that, consequently, Lloyd took no title by that conveyance.

In their bill, the complainants charge that the conveyance by the trustees of the Connecticut Land Company to Lloyd of the land now in dispute was made by a fraudulent combination between the parties to that deed, in violation of the trust with which the land was charged, and with the design of depriving the complainants of their rights; that Lloyd had notice of the trust, and that the conveyance to him was fraudulent and void, seems to be clear. The original shareholders never authorized the trustees to make the assignment to Lloyd, it is believed, in any form, which seems to be apparent from the deed. They incurred no responsibility, nor were they authorized to assume any. The purchaser hoped to make something out of property which resulted from the labor of others, knowing that he could lose nothing. The prospect was a prospect of gain on the one side without loss on the other. Whether Lloyd had any interest in any original share in the company is not known. Whether he paid anything to the trustees is not known. The presumption, from the face of the quitclaim deed, is that, if any consideration were paid, it must have been a nominal amount only.

More than 27 years had transpired since the final adjustment of all claims by this company in 1809, and it would have been forgotten, or, rather, it would not have been brought again into view, had not the purchaser's hopes been quickened by a speculation. He is charged with fraud in procuring from the trustees the deed. Twenty-seven years the claim remained dormant, and there is no reason why its sleep should be disturbed at this late date. Its resuscitation now can impart no vitality to the claim so deliberately abandoned in 1809, nor can it explain the dedication of Bath street in 1801; and, least of all, can it excuse that staleness which now rests upon it. Until 1842, no one took possession of the claim; but at this late period can the new claimant hope to connect it with the deliberate abandonment of 1809, when it was disclaimed by the original shareholders?

The case does not rest upon the statute of limitations, in the opinion of the court, but upon those great principles of equity which are exercised under its own rules by a court of chancery. It is a case not fitted for technical rules and special pleading. The association was formed on liberal principles and on enlarged plans. Immense sums of money have been expended in the construction of railroad depots and other improvements in this city, whose benefits have been extended not only through Ohio, but throughout the West. Having deliberately considered the leading facts of the case, and the law which applies to them, I am brought to the following conclusions:

1. That in 1795 the Connecticut Land Company made a large purchase in the Western Reserve, and issued to the stockholders certificates of stock for their respective interest therein, which was divided into shares; that this stock was vested in trustees, for the purpose of partition and conveyance to purchasers; that the lands were surveyed and distributed among the shareholders.

2. That the town of Cleveland was laid out, and the plot of the town was made into streets and squares, and that Bath street was laid out as the street bordering on the lake, and included the original street on the water line; that it was dedicated as including the land to the lake on the north.

3. The articles of the association were designed as temporary; and that the surveys having been completed, the Indian title extinguished, the shares were distributed among the stockholders in 1809, and a final settlement of their affairs was made of all matters between them; and it was agreed that there should be no other adjustment of their accounts which were then known; and only those which might afterwards be discovered should be examined. None such, it is understood, have been discovered, and any matters known should be considered as abandoned.

4. The claim is alleged to be a stale one, growing out of the beginning of the present century, and will not be aided in equity.

5. That the defendants have expended vast sums of money in the construction of five railroad lines and their depots, at the expense of near a million of dollars, on land made between Bath street and the lake, all of which, or nearly all of which, is now covered by

railroads, depots, and other buildings, for the accommodation of commerce.

6. Under these circumstances and facts I am compelled by a sense of duty to say that I do not think the claim set out in the bill is sustainable in equity in favor of Lloyd or his assignees, or in favor of the Connecticut Land Company. It is therefore dismissed, with costs.